LOUISE ELLIS, Plaintiff, *v.* ANNA MARIA KELSEY et al., Defendants.

Supreme Court, New York Special Term, June, 1922.

Marriage — presumption of — common-law marriage established — parent and child — legitimacy presumed — proof of heirship.

Where C. and plaintiff's mother cohabited together in England from 1840 to 1847, when they came to this country, in a relation apparently matrimonial, and he recognized her as his wife and exercised custody and control over plaintiff only consistent with legitimacy, the presumption arises that they were married according to the laws of England, and in the absence of proof to the contrary the further presumption obtains that the English law in regard to marriage is similar to our own.

It appearing from all the evidence that the parties went through some form of marriage in 1840 and lived together as man and wife from that time until they came to New York state in 1847 in the belief that they had gone through a valid marriage ceremony, the consent necessary to constitute a common-law marriage is established.

C. died in 1887 leaving a large amount of real property in this state and a will which was duly probated whereby he left the bulk of his property to an illegitimate son and his wife and to the survivor of them with remainder to their children if any, but no provision was made in case said son and his wife should die without issue. In 1890 the son conveyed all his interest in the estate to his mother to whom his father was never married and she died in that same year leaving a will duly probated by which all her estate was devised and bequeathed in trust with directions to apply the income for the support of her said son and any children he might have, and in the event of any surplus then to those persons who would be the heirs of C. in case he had not predeceased her, and in the same proportions that they would inherit from him under the laws of the state of New York. The sister of C. died in 1906 leaving a will which was duly probated whereby she left a certain sum in trust for the support of C.'s illegitimate son. She also devised all her right, title and interest in the real estate owned by C. at his death and bequeathed her residuary estate to certain of the defendants herein. The executor of her estate was also the executor of the estate of the mother of C.'s illegitimate son and pursuant to the decrees entered settling his accounts in both of said estates, he paid over all moneys in his hands to the trust company which was the testamentary trustee of both estates, and pursuant to the decree entered upon the settlement of its account, surplus moneys were distributed to the defendants herein. Plaintiff was not cited to any of the accounting proceedings, received no notice thereof nor was she mentioned in the decrees settling said accounts and since distribution there has been a large accumulation of income after the support of C.'s illegitimate son. Plaintiff, claiming to be the legitimate daughter of C., his sole heir, and the person who would be his heir had he died at the time of the death of the mother of his illegitimate son, brings this action to determine the title to the real estate left by C. and for an accounting of said accumulated income. Upon the trial it was not only conceded that plaintiff was the daughter of C. but the evidence to that effect was clear and convincing. *Held*, that in the absence of evidence rebutting the presumption of her legitimacy, it was conclusive, and she having shown by a fair preponderance of evidence that she is entitled to the relief demanded in the complaint, a decree will be entered declaring and establishing her status as the legitimate daughter and sole heir-at-law of C., with further provisions as indicated in the opinion herein.

ACTION to determine title to real property and for an accounting.

*Medina & Sherpick* and *Davis, Symmes & Schreiber (Eugene A. Sherpick* and *Harry H. Thurlow,* of counsel), for plaintiff.

*Harold Swain,* for defendants.

BURR, J. Plaintiff prays to be adjudged the sole heir of George M. Chapman, deceased, and for an accounting. George M. Chapman died September 30, 1887, leaving a large amount of real property in Manhattan and Brooklyn, and also leaving a will, which was duly probated in the Surrogate's Court of New York county, whereby he left the bulk of his property to his illegitimate son, Hawley Chapman, and the latter's wife, Cora Chapman, and to the survivor, with the remainder to their children, if any. This will makes no provision in case Hawley and Cora Chapman should die without children, and there will be an intestacy in such event. Hawley and Cora Chapman are still living, however, and the will of George M. Chapman and the question of who will be entitled to the fee in his realty on the death of Hawley and Cora Chapman without children is not in issue in this action. Hawley Chapman by deed, executed in 1890, conveyed all his interest in the estate of George M. Chapman to his mother, Louise W. Wyeth, who was also known as Louise W. Chapman, and who died in 1890, leaving a will, which was duly probated in the Surrogate's Court of Kings county, whereby she devised and bequeathed all her property to the Title Guarantee and Trust Company in trust, to apply the income for the support of her son, Hawley Chapman, and any children he might have, and in the event there should be any surplus, then to those persons who would be the heirs of George M. Chapman, deceased, in case he had not died before the testatrix, but should have died at the same time with her, and in the same proportion that they would inherit from him under the laws of the state of New York. Julia A. Chapman, the sister of George M. Chapman, died in 1906, leaving a will, which was duly probated in the Surrogate's Court of Westchester county, whereby she left the sum of $6,000 to the Title Guarantee and Trust Company in trust for the support of Hawley Chapman, and also devised and bequeathed all of her right, title and interest in the real estate owned by George M. Chapman at the time of his death and her residuary estate to certain of the defendants in this action. The defendant Samuel Keeler duly qualified as the executor of Julia A. Chapman, deceased, and his account as such executor was duly settled by a decree of the Surrogate's Court of Westchester county entered December 7, 1910. Samuel Keeler also duly qualified as the executor of Louise W. Wyeth, who was also known as Louise W. Chapman, and afterwards filed his accounts as such

executor, which were duly settled by decrees of the Surrogate's Court of Kings county entered July 29 and November 21, 1912, and pursuant thereto he paid over all moneys in his hands to the Title Guarantee and Trust Company as trustee. The latter company also filed its account, which was duly settled by a decree of the said Surrogate's Court entered on April 25, 1913, and, pursuant to said decree, surplus moneys amounting to $13,011.28 were distributed to the defendants in this action. Plaintiff was not cited in any of said accounting proceedings, nor did she receive notice thereof, nor was she mentioned in the decree settling said accounts. Since said distribution there has been a large accumulation of income after the support of the said Hawley Chapman, as to which an accounting is also demanded by plaintiff in this action. The plaintiff claims to be the legitimate daughter of George M. Chapman and Jane Compton Wells and the sole heir of George M. Chapman, and the person who would be his heir if he had died at the time Louise W. Chapman died in 1890. The defendants, while conceding that plaintiff is the daughter of George M. Chapman, deny any marriage between George M. Chapman and Jane Compton Wells, and deny that the plaintiff is the legitimate daughter of George M. Chapman. Defendants claim the right to share in the estate of Louise W. Chapman as devisees of Julia Chapman, the sister of George M. Chapman, and as descendants of Fannie Chapman Beers, the half-sister of George M. Chapman. The defendants, in denying that plaintiff is the legitimate child of George M. Chapman, also claim the benefit of an adjudication in a suit to construe the will of George M. Chapman, wherein there was in the complaint an allegation as to who were the heirs of George M. Chapman, followed by a finding that such heirs did not include the plaintiff. The defendants also allege that the plaintiff has been guilty of laches and has by her conduct estopped herself from now claiming as an heir of George M. Chapman the moneys which the Title Guarantee and Trust Company, as trustee of Louise W. Chapman, has already paid to the persons it believed to be the heirs of George M. Chapman, deceased. It is admitted by all the parties to this action that Louise Wyeth Chapman, the mother of Hawley Chapman, was never married to George M. Chapman. Julia Chapman, deceased, the sister of George M. Chapman, made an affidavit regarding this plaintiff (in evidence in this case), which was filed in connection with the transfer tax proceedings on his estate in 1888, as follows: " Louise C. Ellis was the daughter of deceased, and from the time of her birth and until the death of the above named deceased, a period of over forty years, to my personal knowledge, said deceased stood to her

in the mutually-held relationship of parent." It being conceded on the trial, and the evidence being clear and uncontradicted, that the plaintiff, Louise Ellis, is the daughter of George M. Chapman, a strong presumption of her legitimacy immediately arises, and in the absence of evidence rebutting such presumption of law it is conclusive. *Caujolle* v. *Ferrie,* 23 N. Y. 90; *Matter of Matthews,* 153 id. 443; *Matter of Biersack,* 96 Misc. Rep. 161; affd., 179 App. Div. 916. In *Caujolle* v. *Ferrie, supra,* a decree of the surrogate granting letters to one John P. Ferrie as the legitimate son of Jeanne Du Lux, deceased, was affirmed, and the presumption of his legitimacy was sustained against a reputation at the time of the child's birth that the parents were not married, a separation of the parents very shortly after the birth, and no correspondence between them for the remaining years of his father's life, the abandonment of the child by both parents for twelve years, the use by the mother of her maiden name and the designation by her of the child as her nephew. Davies, J., said at pages 95, 107 and 108: "It being shown and conceded that the respondent was the son of the decedent, he was entitled to the letters. The presumption of the law was that he was her legitimate son; and those who assume the fact of illegitimacy have cast upon them the *onus* of establishing it. * * * The law is unwilling to bastardize children, and throws the proof on the party who alleges illegitimacy; and, in the absence of evidence to the contrary, a child, *eo nomine* is, therefore, a legitimate child. * * * The presumption and the charity of the law are in his favor; and those who wish to bastardize him must make out the fact by clear and irrefragable proof." It appears from the evidence in this case that some time in 1840 George M. Chapman and Jane Compton went to Gretna Green in Scotland, and there went through a marriage ceremony; that relying upon that marriage ceremony they lived together as man and wife in York and in London, Eng.; that as a result of this union plaintiff was born about 1842; that in 1847 Mr. and Mrs. Chapman, with the plaintiff, came to America, George M. Chapman arriving with Mr. Gunn, an uncle of plaintiff on her father's side and Mr. Mason, an uncle of plaintiff on her mother's side, on the *Brittania* at Boston, and plaintiff listed as Miss Sarah Chapman and her mother listed on the passenger list as Mrs. Jane Chapman came on the *Audubon,* arriving in New York October 4, 1847. The passenger lists filed in the custom house and printed in the New York *Herald* offered and received in evidence corroborate this testimony of the plaintiff. That George M. Chapman and Jane Compton thereafter lived in Brooklyn as man and wife in the same home with Eunice Chapman and Julia

Chapman, the mother and sister respectively of George M. Chapman. Plaintiff's mother was known and introduced by George M. Chapman's mother and sister as George's wife. That they all continued to live together until about 1855–1856 when they separated. His wife was stricken with brain fever and was removed to a farm owned by George M. Chapman in Flanders, N. J., while the daughter, this plaintiff, continued to live with her father, his mother and sister at their Brooklyn home when she was not attending the boarding school to which her father sent her. George M. Chapman admitted the Gretna Green marriage and the birth of the plaintiff in England to Mrs. Houghton, one of the witnesses called by plaintiff. The testimony also shows that in 1841, subsequent to the Gretna Green marriage, Jane Compton Wells, then Jane Chapman, inherited £400 and that this amount was turned over by her to her husband, George M. Chapman, who gave a receipt therefor, a copy of which was produced, the original having been burned with other papers of the plaintiff stored in the attic of one of George M. Chapman's houses in St. Mark's place, Brooklyn, in 1885. It also appears from the evidence that prior to coming to America the plaintiff's uncle, Mason, desired to adopt her and that her mother was willing he should do so, but that George M. Chapman refused his consent. In that part of a letter identified as the handwriting of Jane Chapman she writes the Masons that her husband will not allow the adoption and signs her name " J. Chapman," and in the postscript to the letter identified as in the handwriting of George M. Chapman he states he incloses £7 " which Mrs. Chapman says you have disbursed for Louise." The plaintiff testified to the contents of certain letters which were written by George M. Chapman to her mother's English relatives just after George M. Chapman and his wife and child came to this country in 1847, which plaintiff testified had been given to her by these relatives in 1882 and had been stored with her other papers in the St. Mark's place residence. These letters described the voyage from London to New York in detail and told how the writer had to keep the peace between his wife and his sister concerning the method of bringing up the plaintiff, and gave details of their home life and surroundings and a brief reference to the writer's business. The evidence shows that George M. Chapman and the plaintiff's mother cohabited together in England from 1840 to 1847 as man and wife, or in the language of the authorities, " in a relation apparently matrimonial," and that George M. Chapman recognized her as his wife and exercised custody and control over their child only consistent with legitimacy. From this evidence there arises a presumption that they were

married according to the laws of England, and inasmuch as there is no proof to the contrary there is a further presumption that the English law in regard to marriage is similar to our own. *Hynes* v. *McDermott,* 91 N. Y. 451; *Townsend* v. *Van Buskirk,* 33 Misc. Rep. 287. Assuming, however, that the evidence does not clearly establish a valid marriage at Gretna Green and that the evidence of cohabitation and recognition is not sufficient to raise a presumption of a valid ceremonial or other marriage under the English laws, yet all of this evidence does, it seems to me, establish that the parties went through some form of marriage ceremony in 1840 and lived together as man and wife from that time until they came to this country in 1847 in the belief that they had gone through a valid marriage ceremony. It would seem to follow that at the time they came to New York state in 1847 they believed themselves to be man and wife, which establishes the consent that is alone necessary to establish a common-law marriage. *Caujolle* v. *Ferrie,* 23 N. Y. 90, 106. In *Caujolle* v. *Ferrie, supra,* decided in 1861, a clear definition of a common-law marriage is given (p. 106): " The principles of the common law regulating marriage in this State are few and simple. To render it legal and valid, no ceremony, no solemnization, by minister, priest or magistrate, are required. Consent of the parties is the only requisite, and the marriage contract is complete when there is a full, free and mutual consent by the parties capable of contracting, even when such consent is not followed by cohabitation." See, also, *Jackson* v. *Winne,* 7 Wend. 47; *Matter of Seymour,* 113 Misc. Rep. 421; *Matter of Biersack, supra.* Furthermore, plaintiff offered documentary and other evidence showing cohabitation, acknowledgment, declarations (oral and written), conduct, repute, reception among relatives and neighbors and admissions covering the period subsequent to 1847, when George M. Chapman, Jane Chapman and Louise Chapman, the plantiff, were living in this state. *Cramsey* v. *Sterling,* 111 App. Div. 568; affd., 188 N. Y. 602; *Davidson* v. *Ream,* 178 App. Div. 362; *Matter of Garner,* 59 Misc. Rep. 116, 123; *Matter of Terwilliger,* 63 id. 479; *Matter of Biersack, supra; Matter of Seymour, supra.* Plaintiff testified that she and her mother lived with Eunice and Julia Chapman, the mother and sister of George M. Chapman, on Colonade road, Columbia Heights, for about a year; then for a short while on Fulton street and at No. 68 Willow street, and from 1849 to 1885 at No. 66 Willow street, corner of Pineapple street, and the Brooklyn directories from 1847 to 1855 in evidence show that George M. Chapman resided at these addresses during this time. From the testimony of the witness Houghton it appears that George M. Chapman stated that " he returned to London

and brought back with him his wife and their daughter Louise, and that they all lived together in the Brooklyn house," and that he frequently spoke of Jane Chapman as his wife and the plaintiff as his daughter. Plaintiff testified that Eunice and Julia Chapman introduced her mother to neighbors and relatives as " Mrs. Chapman " and as " George's wife," and Julia Chapman, the sister of George M. Chapman, made a declaration under oath (previously referred to) that George M. Chapman had for a period of over forty years recognized the plaintiff as his daughter, all of which was received as competent and admissible as pedigree evidence. 22 C. J. 250–253; *Chamberlain* v. *Chamberlain*, 71 N. Y. 423; *Matter of Kennedy*, 82 Misc. Rep. 214. Jane Chapman, according to the evidence, always carried a watch which bore the inscription, " Jane Chapman, 68 Willow Street," which Eunice Chapman, the mother of George, had often seen. A miniature painting of the plaintiff and her mother having at the foot thereof the inscription, " Madame G. M. Chapman et sa fille," stood in the front room of the Willow street house from 1849 to 1855. This was while George M. Chapman, Jane Chapman, the plaintiff, and Eunice Chapman and the mother of George lived together. George M. Chapman also made a written admission that plaintiff was his daughter on the flyleaf of a prayer book used by plaintiff from 1851 to 1855 in a pew in St. Ann's Church in Brooklyn, which pew was used and occupied by Eunice and Julia Chapman, Jane Chapman and the plaintiff. The inscription in the prayer book is in the handwriting of George M. Chapman, and reads: " To Louise from her Papa, G. M. C., 1851, Louise C. Chapman." I think under the circumstances this is an admission not only that plaintiff was his daughter but that she was his legitimate daughter and that he recognized and accepted her as such. The plaintiff is corroborated not only by documents, but also, as already stated, by two disinterested witnesses. Mrs. Richard Flagg testified to the effect that at Amesbury in September, 1883, and at the Seventy-seventh street house in this city about Christmas of the same year, George M. Chapman admitted that he had married Jane Chapman under the New York laws. He said at Amesbury, according to this witness during the course of a conversation with her aunt, " I simply deny that the Scotch marriage was legal. I married Jane by New York laws." She further testified that during this period George M. Chapman was ill in the Seventy-seventh street house. She paid a visit to him with her aunt, Minnie Bartlett, and during this visit he said to her aunt in the course of a conversation that he did not know about the common-law

marriage (under the laws of New York) until he learned it from a lawyer he had consulted some time in the 70's when he was going to make a will and an agreement in favor of his wife Jane. The witness testified that Jane Chapman and Louise, the plaintiff, were there in the Seventy-seventh street house at the time. Witness further testified she had always known plaintiff's mother as Mrs. Chapman, and that on this occasion George M. Chapman told her aunt, Minnie Bartlett, in the presence of witness, that his wife was there taking care of him. Jane Chapman on this occasion showed to her aunt and to the witness, in the presence of George M. Chapman, the original receipt given by him to his wife for the £400 which she had loaned him many years before. Mrs. Houghton, another witness for plaintiff, testified that in the year 1883 Mr. Chapman visited her home and that she heard him tell the witness' stepmother, Mrs. Gildersleeve, that his physician said his health was in a precarious condition; that he had taken a house in Seventy-seventh street near Madison avenue and that he had sent for his wife and their daughter, Louise Ellis (plaintiff herein), and his granddaughter, Grace Ellis (daughter of this plaintiff), and his sister, Julia Chapman, to come and live with him and take care of him; that his lawyer had advised him some years before to get a release from his wife, so that he could dispose of his real estate, and that he had secured this release from his wife in return for his agreement to leave her a yearly income and to leave her a large amount in his will. This conversation took place at the residence of the witness' stepmother at No. 328 West Twenty-second street, New York city. On another occasion, between the beginning of 1883 and the end of 1885, a message came to Mrs. Gildersleeve that the Chapmans wanted to see her at their home in Seventy-seventh street. Witness went with her stepmother to the house and they were taken to Mr. Chapman's bedroom where he was lying in bed ill. Julia Chapman, his sister, took them there. Mr. Chapman talked about Louise and her mother being then ill in the house. He talked about a $10,000 note which he had given Louise in consideration of the £400 legacy given him by his wife, Louise's mother, in England shortly after their marriage. In explaining about this note to Mrs. Gildersleeve the witness heard Mr. Chapman tell how he and Jane had eloped to Gretna Green and how they were married there and how they returned to London and lived with Jane's uncle, Volney Gunn, and that Louise was born to them there; that a year or so later his wife Jane had a legacy of £400; that this, under the law of England, was given to him as Jane's husband and that he had used a part of this money to buy an interest in

a New York firm which he then represented in London and Paris; that owing to business troubles he was ordered to New York, took a house in Brooklyn and sent for his mother and sister from Auburn, N. Y., and how he then returned to London and brought back with him his wife and their daughter Louise and that they all lived together in the Brooklyn house. After talking with Mr. Chapman her stepmother took the witness to Mrs. Chapman's room where they found Mrs. Chapman and her daughter Louise. On another occasion during this period Mr. Chapman called at the home of the witness' father, and when he was speaking about Louise Ellis, his daughter, he stated how much better it would have been if his daughter Louise had been a boy, so that she could help him in managing his business, and she also testified that Miss Julia Chapman, who was Mr. Chapman's sister, often came to the witness' home and often spoke affectionately of Louise Ellis as her niece. The testimony of these witnesses is clear and convincing. An effort was made to discredit or weaken their testimony and to show that George M. Chapman never lived at Seventy-seventh street at any time during the period of 1883 to 1885. Plaintiff introduced a letter written by George M. Chapman from some illegible address in Seventy-seventh street on May 15, 1885. The plaintiff testified to the exact location of this house on the north side of Seventy-seventh street, three doors west of Madison avenue, and that it was leased by George M. Chapman from a Mr. Kirby, the owner. As against this evidence there is the uncorroborated testimony of Mrs. Cook that George M. Chapman never lived on Seventy-seventh street during the period 1883 to 1885. The letter of May 15, 1885, above referred to, was introduced to refute her testimony. The testimony of Mrs. Cook was clearly biased, her memory was unreliable, and altogether it impressed me as untrustworthy. Although she had been married twice, she was unable to remember the name of her first husband, nor did she remember the date of her marriage, the names or the date of birth of her twin children buried in the Chapman plot. The official records proved her memory to be remarkably defective, to say the least. George M. Chapman was apparently content with his wife and entertained no doubts as to the legality of his marriage until he desired the possession of another woman. Like King Henry the Eighth he then began to have " conscientious scruples." But as in the king's case, so with Chapman, it was not really that doubt as to his marriage " has crept too near his conscience," but rather that " his conscience has crept too near another lady." About 1855–1856 Chapman put away his wife, Jane Compton, to take up with Louise Wyeth, a woman to whom

it is conceded he was never married. He supported and maintained his wife until his death, but he transferred his affections and his company to Louise Wyeth, with whom he continued to live until shortly before his death, when we find him in precarious health again living with his wife, Jane Compton, and her daughter, this plaintiff, at the home in Seventy-seventh street. I believe it is clear from the evidence in this case that he deliberately refrained from entering into a marriage with Louise Wyeth, by whom he had two children, Hawley Chapman being the only one living, because he realized, and had been advised by his lawyer, that he was lawfully married to Jane Compton not only under the laws of England, but also under the laws of the state of New York. When Jane Compton consulted Governor Straw of New Hampshire in· 1872 regarding a divorce Chapman quickly entered into a written agreement to pay her forty dollars per month and to provide for her in his will. He had lived with her as man and wife in England from 1840 to 1847 and in the city of Brooklyn from 1847 to 1855. He had recognized and held her out as his wife. He had recognized and brought up their child, this plaintiff, and educated her. He had lived for years with them in the same home in which his mother and his sister lived, and when Jane Compton died she was buried by the side of her husband, George M. Chapman, in his plot at Greenwood Cemetery. The law presumes morality and not immorality; marriage and not concubinage; legitimacy and not bastardy. I do not think the claim of the plaintiff as to the marriage is impaired or the presumptions of law overcome by any of the evidence introduced by defendants showing or tending to show apparent acquiescence, resignation or submission on the part of Jane Compton to her enforced separation from her husband. From all the evidence in this case, I am convinced that Jane Compton Chapman was the wife of George M. Chapman and lived with him and was recognized by him and held out by him as his wife in England and in this state, and that under the laws of England and under the laws of the state of New York they were legally married; that her relation with George M. Chapman was not meretricious in its inception or during its continuance and that the plaintiff is the legitimate daughter of George M. Chapman and Jane Compton. Neither the decree of Surrogate Ketcham, nor the judgment or findings in *Chapman* v. *Chapman* under the evidence in this case constitute a bar against this plaintiff (*Springer* v. *Bien*, 128 N. Y. 99, 102; *House* v. *Lockwood*, 137 id. 259, 268; *Stokes* v. *Stokes*, 155 id. 581, 592; *Stannard* v. *Hubbell*, 123 id. 520, 528; *Sweet* v. *Tuttle*, 14 id. 465), nor is the plea of laches on the part of the plaintiff sustained by the evidence.

*Conery* v. *Sweeney*, 81 Fed. Rep. 14; *Brant* v. *Virginia Coal & Iron Co.*, 93 U. S. 326, 335; 21 C. J. 1120, § 124-c; *Bowery Sav. Bank* v. *Belt*, 66 Hun, 57; *Galway* v. *Met. Elev. Ry. Co.*, 128 N. Y. 132. Plaintiff did not know of her legal rights until informed by Bacon, the attorney, in 1915. This action was begun in 1916. There is no evidence of reliance by the defendants to their injury upon plaintiff's course of conduct. 21 C. J. 1126, § 130-e. The distribution of the $13,000 was made without citing unknown legatees and consequently was made by the trustees at their peril. *Matter of Killan*, 172 N. Y. 547. They were well aware that the plaintiff was the daughter of George M. Chapman and that Judge Dickey had made a finding to that effect, and further that she had definitely taken her stand in connection with the legacy left her by Julia A. Chapman, which legacy she rejected rather than waive her rights as heir of George M. Chapman and that there had been no occasion up to the time of the accounting when plaintiff could have asserted her claim. The plaintiff is not guilty of laches as claimed by defendant. She asserted her rights as soon as she was advised as to what those rights were. The decrees, judgments and findings offered in evidence are not *res adjudicata* against her. See cases cited above. In my opinion, plaintiff has proven by a fair preponderance of the evidence that she is entitled to the relief demanded in the complaint and to a decree declaring and establishing her status as the legitimate daughter and sole heir at law of George M. Chapman, deceased, and the person who would be the sole heir of said George M. Chapman, deceased, in case he had not died before Louise W. Chapman, deceased, but should have died at the same time with her, and requiring and directing the defendants Samuel Keeler, as executor under the will of Louise W. Chapman, deceased, and the Title Guarantee and Trust Company, as trustee under said will, to render accounts of their proceedings as such executor and trustee, respectively, and to pay to the plaintiff the amount or amounts due her under the terms of the will of said Louise W. Chapman, deceased, with interest thereon; and further providing, directing and adjudging that said Julia A. Chapman had no interest as heir, or by sale under execution and assignment to use or otherwise, in the real estate owned by said George M. Chapman at the time of his death, and that the devisees and legatees under the 17th clause of the will of Julia A. Chapman, deceased, took no right, title or interest thereunder in and to the real estate owned by George M. Chapman at the time of his death; and that any conveyances, payments and distributions made by the defendant Samuel Keeler as executor under the will of said Julia A. Chapman or as executor under the

will of Louise W. Chapman, or by the Title Guarantee and Trust Company as trustee under the will of Louise W. Chapman of any right, title or interest in the real estate owned by George M. Chapman at the time of his death, to the devisees and legatees under said clause of the will of Julia A. Chapman or their heirs, executors, administrators or assigns were made wrongfully and in contravention of the rights of this plaintiff; that by clause 17 of the will of Julia A. Chapman, deceased, said Julia A. Chapman attempted to devise the beneficial interest claimed by her in the surplus of the trust fund created under the will of Louise W. Chapman; that this was an attempt to devise a beneficial interest in the surplus of a trust fund measured by the life of another, and, therefore, void and of no effect at law, and that the devisees and legatees under the said 17th clause of the will of said Julia A. Chapman, deceased, took no right, title or interest thereunder in and to the real estate owned by said George M. Chapman at the time of his death, and that any conveyances, payments or distributions made by the defendant Samuel Keeler as executor under said will of Julia A. Chapman, deceased, or by the defendant Samuel Keeler as executor under the will of Louise W. Chapman, deceased, or by the defendant Title Guarantee and Trust Company as trustee under the will of said Louise W. Chapman, deceased, to the legatees named in said clause 17 of the will of said Julia A. Chapman, or to the heirs, executors, administrators or assigns of such legatees were unlawfully made in contravention of the rights of the plaintiff in this action; that none of the above-named defendants were entitled, under the terms of the will of Louise W. Chapman, to any of the moneys received by them from the defendant Title Guarantee and Trust Company as aforementioned, and that the same were paid to them unlawfully in violation of the trust created in said will of Louise W. Chapman, deceased, and in deprivation of the rights of the plaintiff herein, who, as sole heir of George M. Chapman and the person who would be the sole heir of George M. Chapman, deceased, in case he had not died before Louise W. Chapman, deceased, but should have died at the same time with her, was and is entitled to all surplus income from the trust estate under the will of Louise W. Chapman, deceased, after maintaining Hawley Chapman in a suitable manner. Judgment for plaintiff, with costs and disbursements. Plaintiff's findings signed. Submit decree on notice to all parties interested.

**Judgment accordingly.**