In the Matter of the Estate of HARRY J. SMITH, Deceased.

Surrogate's Court, Kings County, May 5, 1930.

*William Pinkney Hamilton, Jr.*, for the petitioner.

*Milton Solomon*, special guardian.

WINGATE, S. In its material aspects the present proceeding possesses negligible interest, but its bearing upon human rights raises questions of transcendent importance. The issue, in brief, is whether, under the applicable rules of law, the court is compelled to stigmatize the three infant children of this decedent with the

bar sinister and brand them throughout all time with the opprobrium of being bastards.

Though merely human, it is extemely regrettable that due, no doubt, to the inevitable smallness of the reward which counsel can expect from the estate, the material consideration has been permitted to dominate the presentation. The evidence submitted is unsatisfactory to a degree, and the court has been compelled to attempt a solution of these profound problems practically unaided. The case has now been finally submitted, and a determination must be attained on the record as it stands.

Harry Jamison Smith, the decedent, died intestate on July 23, 1924. On February 7, 1928, administration on his estate was granted by this court to Joshua Smith, a brother. The present proceeding arises upon a petition for the voluntary judicial settlement of his accounts as such administrator. This petition alleges that among those interested and entitled to citation are Zola Molm, 1357 Eighty-eighth avenue, Oakland, Cal., Martha Leona Peck, Harry Jamison Smith and John Priest Smith, the whereabouts of all of whom is stated to be unknown to petitioner.

The petition contains the further allegations: " That all of the above-named parties are of full age and of sound mind, except the said Zola Molm, Harry Jamison Smith, and John Priest Smith, who, as your Petitioner is informed and believes, are all infants over the age of fourteen (14) years and none of them has a general or testamentary guardian; that the said Harry J. Smith deceased, was the father of the said infants and that the Mother of the said infants, as your Petitioner is informed and verily believes, is the said Martha Leona Peck, whose whereabouts is unknown to your Petitioner and that your Petitioner does not know where the said infants, Harry Jamison Smith and John Priest Smith reside, or their whereabouts."

Supplementing this petition and filed therewith was an affidavit by the attorney for the petitioner, which recites certain correspondence with persons in California in an effort to locate the missing persons. Shorn of self-serving statements, the material allegations contained in this affidavit are the following:

" I wrote to the said Corby, who replied stating that the said decedent was married to Martha Leona Peck but he did not know their addresses; that he had understood the parties were divorced. * * * Mr. Carr turned this item of business over to Hiram R. Baker, an attorney at law, in Redding, California, who wrote me on March 16th, 1926 * * *. Mr. Baker advised that he had spoken with Harry Donnelly, who was of opinion that these people were married; that Donnelly referred him to Mr. Corby, a

Mr. Tucker and Mr. Middleton; that he had not then been able to collect any competent evidence to the effect that the decedent and Martha Leona Peck were never married * * *. Mr. Baker wrote me again on August 2d, 1926, sending me copies of birth records of Zola Lee Smith, John Priest Smith and Harry Jamison Smith, which copies are annexed hereunto. * * *.

" I received a letter from one, J. H. Tucker, Past Worthy President of the Fraternal Order of Eagles, in which he stated that the parties were living together, seemingly as man and wife; that he knew them well; * * *."

Attached to the affidavit are three copies of birth certificates, the first of Zola Lee Smith, on May 31, 1910; the second of Harry Jamison Smith, on November 16, 1911, and the third of John Priest Smith, on February 25, 1913. All give the name of the father as Harry Jamison Smith and the maiden name of the mother as Leona Martha Peck, Leona Peck and Martha Leona Peck, respectively. They respectively state the age of the father at his last birthday as thirty-three, thirty-five and thirty-seven, and of the mother as twenty, twenty-one and twenty-two.

Such was the state of the record prior to the hearings, and it will be of advantage to pause for a moment and consider its legal effect at this point. Its purport is that decedent and an identified woman, namely, Martha Leona Peck, were living together for a period of several years in the apparent relation of husband and wife; that their reputation in the community was that of married persons, one informant, Corby, stating definitely that they were married; that no competent evidence to the contrary has been found; that between May 31, 1910, and February 25, 1913, they had three children, all of whom were recognized by them both, all given the surname of the decedent, and one of them also given his full Christian and middle names.

This showing is sufficient to raise a presumption that the decedent and this woman, Martha Leona Peck, were validly married. Such a presumption has been indulged since very early times as is noted by the Court of Appeals in its decision in *Caujolle* v. *Ferrie* (23 N. Y. 90), which at page 104 quotes the language of Lord STAIR (Inst. lib. 1, tit. 4): " Cohabitation and the behavior of man and wife for a considerable time, presumeth marriage, though there be neither contract, promise, nor sponsalia proceeding, nor evidence of copulation by children."

Even a cursory reading of the multitudinous cases on the subject in the courts of this State demonstrates their uniform adherence to this principle. A few typical examples will suffice to illustrate the point.

In *Caujolle* v. *Ferrie* (23 N. Y. 90) the court says (at p. 106): " But proof of an actual marriage was not necessary. Such strict .proof is only required in prosecutions for bigamy, and in actions for criminal conversation. A marriage may be proved in other cases from cohabitation, reputation, *acknowledgment of the parties*, reception in the family, and other circumstances from which a marriage may be inferred. No informal solemnization of marriage was requisite."

At page 102: " * * * a strong circumstance in corroboration of this position, to my mind, is, that the child born to him by her took, with his privity and by his procurement, his own name, by which he has always been known, through the whole of his life."

In *Gall* v. *Gall* (114 N. Y. 109) we read (at p. 118): " A present agreement between competent parties to take each other for husband and wife constitutes a valid marriage, even if not in the presence of witnesses (citing cases). Such a marriage may be proved by showing actual cohabitation as husband and wife, acknowledgment, declarations, conduct, repute, reception among neighbors and relations and the like."

This doctrine is further devolved by the Appellate Division of the First Department in *Tracy* v. *Frey* (95 App. Div. 579, at p. 583): " In the absence of proof, the presumption is of marriage arising out of cohabitation in the apparent relation of husband and wife, of the innocent and lawful character of such relationship and of the legitimacy of children which are the fruit of such a union. In no branch of the law is the presumptive rule more rigidly enforced."

*Matter of Seymour* (113 Misc. 421) contains the following (at p. 427): " An actual marriage may be presumed from matrimonial cohabitation and acknowledgments of the parties. A mere formal contract is not the essential thing. Marriage is a *status* which may be established by the words, actions, and the lives of the parties evidencing their understanding and intent." (See, also, *Ellis* v. *Kelsey*, 118 Misc. 763, 767, 768; affd., 208 App. Div. 774; 214 id. 784, and affd. so far as concerns this question, 241 N. Y. 374, 379; *Matter of Moncrief*, 235 id. 390, 392; *Matter of Leslie*, 175 App. Div. 108, 111.)

It being apparent from these citations that the facts shown in the petition and supplementary affidavit raise a presumption of marriage, the effects of such presumption become pertinent.

It was said in *Clayton* v. *Wardell* (4 N. Y. 230, at p. 232): " The only difference between a marriage celebrated by formal ceremony, and one not so celebrated, is that, in the former case, the regular celebration is conclusive evidence of the mutual consent requisite

to the validity of the marriage, while in the latter it is competent to rebut the proof of the marriage by other evidence."

While, therefore, it is unquestionable that rebutting testimony in a case where no ceremonial marriage has been shown, is *admissible*, the cogency of such evidence to produce a determination of non-marriage, is, on the decisions, no less established.

*Matter of Biersack* (96 Misc. 161; affd., 179 App. Div. 916) at page 178, quotes with approval the language of *Chancery* v. *Whinnery* (147 Pac. [Okla.] 1036) as follows: " When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a presumption of its legality, not only casting the burden of proof on the party objecting, but requiring him throughout and in every particular plainly to make the fact appear, against the constant pressure of this presumption, that it is illegal and void."

To like effect see *Tracy* v. *Frey* (95 App. Div. 579, 596, 597).

The applicable law in this State on the subject appears clearly to follow the statement of Lord COTTENHAM in *Piers* v. *Piers* (2 H. L. Cas. 233), that " A presumption of this sort, in favor of marriage, can only be negatived by disproving every reasonable possibility," or as the principle is stated in the *Biersack* case (at p. 177): " Proof — comprehensive and inevitable — is the only thing she can supply to satisfy the law. Probability may often be called to the aid of evidence, but it can never help when there is no evidence. It is never in itself alone either proof or the equivalent of proof, but whatever may ordinarily be its probative value, none of it is for this respondent."

In this connection it must also be borne in mind that " The presumption of marriage does not assume that it took place at any particular place, manner or time; it means that a legal marriage existed." (*Matter of Hinman,* 147 App. Div. 452, 453; affd., 206 N. Y. 653.)

While the burden cast by the law upon any person attacking the validity of a *de facto* marriage is great, the presumption in favor of the marriage is less strong than the presumption that a recognized child is legitimate. (*Caujolle* v. *Ferrie,* 23 N. Y. 90, 95, 107; *Ellis* v. *Kelsey,* 118 Misc. 763, 766; affd., 208 App. Div. 774; 214 id. 784; affd., as to this matter, 241 N. Y. 374, 379; *Matter of Leslie,* 175 App. Div. 108, 111; *Matter of Biersack,* 96 Misc. 161, 166; affd., 179 App. Div. 916; *Mace* v. *Mace,* 24 id. 291, 293.)

It is said in the *Biersack Case* (*supra,* at p. 167): " the zeal of the law, which would prefer to find matrimony rather than vice, increases in its benign extravagance when it is called to the defense of legitimacy. That which is one of the strongest presumptions

known to the law, when invoked in behalf of marriage, is said to be strengthened when its shield is raised above a child. (*Hynes v. McDermott, supra.*) "

The presumption of legitimacy " is based upon broad principles of natural justice " and springs into being in whatever connection the question arises. (*Matter of Matthews*, 153 N. Y. 443, 447.)

The effect of this presumption has been frequently stated by the highest authority; a few examples of which may prove illuminating. Thus it is said in *Caujolle* v. *Ferrie* (23 N. Y. 90, at p. 108): " * * * those wish to bastardize him must make out the fact by clear and irrefragable proof."

In applying this rule, the court, in *Tracy* v. *Frey* (95 App. Div. 579, 586) says: " Webster's International Dictionary defines irrefragable to mean ' not to be refuted or overthrown; unanswerable; incontestable; undeniable.' " (See, also, *Hynes* v. *McDermott*, 91 N. Y. 451.)

In its most recent decision on the subject, the Court of Appeals, in *Matter of Findlay* (253 N. Y. 1), after reviewing a number of these definitions, says (at p. 8): " What is meant by these pronouncements, however differently phrased, is this and nothing more, that the presumption will not fail unless common sense and reason are outraged by a holding that it abides," which is substantially equivalent to its former holding in *Matter of Matthews* (153 N. Y. 443).

The practical result is that " those who assume the fact of illegitimacy have cast upon them the *onus* of establishing it " (*Caujolle* v. *Ferrie*, 23 N. Y. 90, 95); they must disprove every reasonable possibility of legitimacy (*Caujolle* v. *Ferrie*, 23 N. Y. 90, 109; *Matter of Biersack*, 96 Misc. 161, 166, 176; affd., 179 App. Div. 916; *Barker* v. *Barker*, 172 id. 244, 249), even to the extent of proving negatives (*Matter of Biersack*, 96 Misc. 161, 178; affd., 179 App. Div. 916; *Matter of Meehan*, 150 id. 681).

As is said by the court in the last cited case (at p. 684): " it is incumbent upon whoever assails the validity of the marriage and the legitimacy of the children to prove his case by evidence instead of presumptions, even if that involve proof of a negative."

Improbability alone will not break the cogency of the presumption (*Matter of Findlay*, 253 N. Y. 1, 10), nor will a result of illegitimacy be reached by a balancing of probabilities. (*Matter of Findlay*, 253 N. Y. 1, 8; *Van Aernam* v. *Van Aernam*, 1 Barb. Ch. 375, 377; *Matter of Biersack*, 96 Misc. 161, 177; affd., 179 App. Div. 916.)

In short, as stated in the last cited case (at p. 177): " The tender, but stern, compassion which enfolds this child has girt him about

with a defense against which hostile force may prevail only by annihilation."

With these clearly defined tests of the quality of petitioner's proof in mind, we now approach the "evidence" which he has adduced in support of his claim that these three children of the decedent are illegitimate.

The first and only oral testimony was adduced at the hearing of October 16, 1929, the witness examined being one Ella Hawkins, a sister of decedent and an alleged next of kin, who was permitted, without objection, to testify to personal transactions with the decedent. Had objection to this testimony or to the competency of the witness been made, the court would have excluded it, both under section 347 of the Civil Practice Act and under *Tracy* v. *Frey* (95 App. Div. 579, 593); *Matter of Taylor* (9 Paige, 611, *617); *Van Tuyl* v. *Van Tuyl* (57 Barb. 235, 241). However, no objection was interposed, and, therefore, the observations of the Court of Appeals in *Matter of Findlay* (253 N. Y. 1, 11) become pertinent: " Whatever was received in that regard was without objection and exception, and must, therefore, be considered, whether competent or incompetent. (*Flora* v. *Carbean*, 38 N. Y. 111, 113.) "

The gist of the testimony of Mrs. Hawkins was that she was a sister of decedent; that she was present at his funeral; that it was seven years since she had last seen him, and that before that, she had not seen him for twenty-five years, although she had occasionally heard from him. She thought he had been in the army or navy. She then related an alleged conversation with the deceased as follows: " It happened that my daughter was at my home and she had her children and he happened to say he had three little ones, and I said to him, ' Why, are you married? ' And he laughed in my face. So after they departed and no one was there I asked him all about it. He told me no; he was not married. Q. Did he tell you the name of the woman he had been living with? A. He said he was not married to Leona Peck. Q. Did he say the children were his children? A. That is how he stated. Q. Did he say they were Leona Peck's children? A. That is what I understood him to say. Q. Did he tell you why he was not living then with Leona Peck? A. I asked him. That is, I tried to ask him and he said she run off with a young man and I asked him why she did such a thing as that, and he said youth is youth."

The petitioner contends that this testimony proves that the children are illegitimate. In the opinion of the court it not only proves no such thing, but its tendency is the exact reverse.

The date of this alleged declaration was fixed as about the year

1922, approximately twelve years after the birth of Zola Smith, eleven years after the birth of Harry Jamison Smith and nine years after the birth of John Priest Smith. The only natural construction of the language of the witness is that decedent declared that at the time of such conversation "he was not married;" "he was not married to Leona Peck," "that she run off with a young man." He distinctly did *not* say that he had never been married to her. In the same breath, moreover, he said that "he had three little ones;" that "the children were his children."

Not only is this an emphatic reaffirmation by the decedent of the paternity of his three children, but it is corroborative of the information sworn to in the affidavit filed with and supplementary to petitioner's accounts: "I wrote to said Corby, who replied stating that the said decedent was married to Martha Leona Peck * * *; that he had understood the parties were divorced."

Whatever weight this testimony may be entitled to receive, it cannot be taken at greater than its face value, which is that in or about 1922 decedent stated that he had three "little ones" and was then unmarried. This was a declaration of a then existing status which even if it did not encounter the stronger presumption of legitimacy, would not be held to run backward (*Hanna* v. *Stedman*, 230 N. Y. 326, 338; *Niehoff-Schultze Grocer Co.* v. *Gross*, 205 App. Div. 67, 74; affd., 237 N. Y. 509; *MacRae* v. *Chelsea Fibre Mills*, 145 App. Div. 588, 591; *Joannes Brothers Co.* v. *Czarnikow-Rionda Co.*, 121 Misc. 474, 476; affd., 209 App. Div. 868; *Matter of Auditore*, 136 Misc. 664), and can, therefore, have no possible bearing on his status from about 1909 to 1913, during which period the children in question were born.

Having ineffectually flown this trial balloon and learned that the court would not determine the questions involved until all proofs were in and the case closed, the petitioner adjourned the hearing from time to time, and, finally, on March 12, 1930, submitting his "proofs."

The first of these "proofs" consisted of a renunciation by Ella Hawkins of her distributive share in the estate in an effort to remove the inherent objection to her competency under section 347 of the Civil Practice Act. Whether or not such an act, amounting to an assignment by operation of law of her interest in the estate to her brother and sister, would suffice to render her a competent witness, need not be determined, since her testimony must be considered a part of the record, in view of its admission, without objection, as above noted.

The remaining matters submitted consisted of an affidavit of

Charles F. Fiege, verified February 12, 1930, an affidavit of C. A. Hoffmaster, verified February 19, 1930, two affidavits of Martha Leona Peck Senges, verified, respectively, October 28 and November 29, 1929, certain specified sections of the Civil Code, of the Code of Civil Procedure, and of the Political Code of the State of California, and a return of the Bureau of Vital Statistics of California. These matters, as stated on the record, were offered subject to a stipulation between the attorney for the petitioner and the special guardian. Although such a course was suggested by the court (stenographer's minutes, p. 11), the stipulation was not offered in evidence, so that the only basis for decision is contained in the affidavits submitted and the record itself.

As stated by petitioner's attorney on the record, the stipulation respecting these several affidavits was that they " be received in evidence herein in lieu of the oral testimony of the " several affiants, " and with the same force and effect as if the said testimony had been orally given under oath in open court by the " several affiants, " objections to form being waived but objection to competency, materiality and relevancy being reserved."

The Fiege affidavit reads in part as follows: " I, Charles F. Fiege, Adjutant & Inspector, Pacific Branch, National Home for Disabled Volunteer Soldiers, Los Angeles County, California, do hereby state that according to the records of this said National Home, Harry J. Smith, Deceased, applied for admission to the Home on June 27, 1923  *  *  *.

" It is further shown that upon applying for admission  *  *  * the deceased stated that he was single and named his Sister, Mrs. A. W. Hawkins, 1728 South 17th Street, Philadelphia, Pennsylvania, as his nearest relative. The records in the case  *  *  * indicate nothing relative to Martha Leona Peck, James Priest Smith, Harry Jamison Smith or Zola Lee Smith."

It must be apparent that this affidavit, which, under the stipulation, has the same weight as oral testimony, is hopelessly incompetent. The affiant purports only to state the contents of certain records. These records themselves would have been inadmissible in the absence of a showing, which is not here made, that they were correct or made pursuant to duty. (*Pneumatic Signal Co.* v. *Texas & P. Ry. Co.*, 216 N. Y. 374, 376; *State Bank of Pike* v. *Brown*, 165 id. 216, 221; *N. Y., N. H. & H. R. R. Co.* v. *Baldwin Universal C. Co.*, 219 App. Div. 578, 581; *Meyer* v. *Nassau Elec. Railroad Co.*, 152 id. 709, 711.) So far as this witness was concerned, they were pure hearsay. The testimony is, however, open to the more serious objection that it is not the best evidence, since it is a fundamental rule that oral testimony as to the contents of

admissible records is inadmissible without the requisite preliminary proof. (*Matter of Barney*, 185 App. Div. 782, 799, 800; *Levy* v. *Mott Iron Works*, 143 id. 7, 11; *Duffy* v. *Beirne*, 30 id. 384, 385; *Lampe* v. *Platt*, 76 Misc. 439, 440.)

Even if otherwise competent, it could be of no possible materiality only so far as it related to the decedent's alleged statement that he was single and that his sister was his nearest relative. Since this alleged declaration did not specifically mention the children it would appear inadmissible in evidence on the instant issues under the decision of *Van Tuyl* v. *Van Tuyl* (57 Barb. 235, 241). In any event it would at most be a self-serving declaration, inadmissible on usual principles. (*Tracy* v. *Frey*, 95 App. Div. 579, 593.)

Finally, even if the admissibility of this evidence were granted, yet it has no probative force whatever, except as indicating that on June 27, 1923, the decedent was unmarried and that in the event of his death he desired his sister to be notified of the fact.

The Hoffmaster affidavit alleges merely that he is acquainted with Martha Leona Peck Senges and knew her when she resided with the decedent, and that he also knew their children.

Next for consideration are the two certificates of the California State Board of Health to the effect that an examination of the State Index from July 1, 1905, to October 31, 1929, for the marriage of " Martha Leona Peck and ?? Senges " and " Harry J. Smith and Martha Leona Peck " has been made, " but that no reference to this event is to be found therein."

Upon what theory the petitioner bases his idea that these certificates may be admissible in evidence, does not appear.

Neither in the former New York Code nor in the present Civil Practice Act is there any provision for such certificates. The question of proof of records and documents without the State is expressly regulated by sections 391 to 398 of the Civil Practice Act, which, while providing the procedure for proof of foreign records and documents (§ 398), makes no provision for those of other States except in the cases of statutes, decrees and decisions (§ 391).

The admissibility of such evidence is distinctly questioned in *People* v. *Bromwich* (135 App. Div. 67, at pp. 71, 72, and in the affirming decision in 200 N. Y. 385, at p. 388).

Were the question of any particular importance in this case, the court would be inclined to decide on the basis of the expressed inclination of the Appellate Division and the Court of Appeals, and reject the certificates.

In any case, their only effect is, that on February 11, 1930, a search of an index of marriages was made and that the searcher found no reference to the object of his search.

The disposal of these preliminary considerations brings us to the main " evidence " submitted, which concerns the supposed affidavits of Martha Leona Peck Senges and the law applicable to the case.

It is contended by the petitioner that the effect of these affidavits is that the mother bastardizes her children by a showing that she did not enter into any ceremonial marriage with the decedent. This result is further predicated upon the claim that the question of the legitimacy of the children must be determined in accordance with California law, and that the relevant California law required a ceremonial celebration as a condition precedent to the validity of the marriage.

On the record as it stands, therefore, the petitioner must prove against the constant pressure of the presumption of legitimacy:

1. That the mother is a competent witness to bastardize her own children.

2. That the California law at all times subsequent to the first cohabitation of the decedent and Martha Leona Peck, voided a non-ceremonial marriage.

3. That the California law alone governs the question, and

4. That the effect of the affidavits of the mother, if competent, is to bastardize the children.

If the petitioner fails in the forging of any link in this chain of positive proof, the decision must be against him. If the testimony of the mother is incompetent, there is nothing left in the record upon which a finding of illegitimacy can be based; if the law of California as existing at the time of the transactions in question be not proved to invalidate a non-ceremonial marriage, or if any other law, not definitely proved, may be applicable, then the common law will be held to govern and the marriage declared valid for the reasons and under the decisions hereinbefore considered; and, finally, if the affidavits of the mother, if competent, when construed in the light of the presumption of legitimacy, do not prove illegitimacy, the case falls.

Approaching, first, the question of the competency of the mother to give testimony tending to bastardize her children, we start with the well-known and oft-repeated statement that if a mother's testimony is offered for the purpose of establishing her child to be illegitimate, it is not competent, and cannot be considered because it is against public policy to allow her to bastardize her own child. (*Matter of Barthel*, 111 Misc. 727; affd., 192 App. Div. 926; *Cross* v. *Cross*, 3 Paige, 139; *Flint* v. *Pierce*, 136 N. Y. Supp. 1056; *Timmann*, 142 id. 298; *Taylor* v. *Taylor*, 123 App. Div. 220; *Fanning* v. *Fanning*, 2 Misc. 90; Steph. Ev. art. 98; Jones Ev. § 97; *Chamberlain* v. *People*, 23 N. Y. 85.)

The petitioner, while conceding the correctness of this statement as a general position, correctly contends that all of the foregoing cases and others usually cited for the position were instances in which a valid marriage was conceded to exist. Although citing no authority for his position, he contends that the rule should not apply where the marriage itself is also in issue. The court has found three cases — and only three, after diligent search — in which language supporting his contention may be found. These are *Van Tuyl* v. *Van Tuyl* (57 Barb. 235), where the testimony of an alleged common-law wife *in favor* of the legitimacy of her children was admitted, the case containing a dictum at page 239 that her testimony to bastardize would also be admissible. *Goodright* v. *Moss* (Cowp. 591, 593, decided by King's Bench on May 1, 1777), in which in an action in ejectment it was held that a mother's affidavit in another (unidentified) proceeding was admissible on the issue; and *The King* v. *Bramley* (6 Durnf. & East, 330, decided by King's Bench in 1795), in which it was held that a woman could testify as to non-marriage on an issue as to which of two parishes was liable for her support and that of her children as destitute persons.

It is, of course, obvious that a mother may testify to non-marriage in ordinary statutory bastardy proceedings and this seems to remove any authority which the two old English cases might possess. This leaves us with the authority of the *Van Tuyl* decision that she can testify *in favor* of legitimacy and its unsupported dictum that she is also competent as an adverse witness.

As against this position we read in *Matter of Hinman* (147 App. Div. 452; affd., 206 N. Y. 653, at p. 453): " The husband is dead, the wife is an incompetent witness to prove the time, place or manner of marriage. If he were living and she were a competent witness they might be able to prove that the marriage took place in all respects according to the laws of this State, but they are necessarily silent. The marriage does not fail for that reason."

An extremely pertinent and interesting opinion on the subject is found in *Scherpf* v. *Szadeczky* (4 E. D. Smith, 110), the reasoning of which is so closely knit and convincing as to be incapable of adequate paraphrase. This was an action for enticing a wife away from her husband's home. The defense was a general denial. At the trial the plaintiff produced evidence of cohabitation, general reputation and acknowledgment by himself and the woman in question, and it appeared that both had held themselves out as man and wife. Defendant offered to prove by the woman that she was not really married to the plaintiff, which evidence was excluded.

In reaffirming this result, the court says (at p. 114): " The rule that a wife is not competent to testify against her husband is not questioned, but it is urged that when the question, whether the proposed witness is a wife or not, is the very question upon which the jury are to pass, she is competent. In other words, that the court cannot say she is the wife, and so exclude her, because that is deciding in advance the very question of fact which should be left to the jury.

" A plausible answer to the defendant's argument, though perhaps liable to similar, yet to no greater criticism, may be stated thus: If the proofs, without her testimony, do establish the marriage, then the jury will so find, * * * and the defendant must have a verdict. So that to allow her to testify is to assume that no marriage is proved, and if that be assumed by the court, then the plaintiff should be non-suited, and no evidence from the defendant was necessary. While to exclude her testimony is only to say, that the court deems the marriage *prima facie* established. If the jury should so find, then the exclusion is clearly proper; if the jury do not so find, then the exclusion works no prejudice, since the defendant has a verdict.

" The true ground for rejecting her testimony, however, is not involved in either of these syllogistic processes of reasoning.

" These counter propositions may, however, be useful to a true understanding of the rule. They both proceed upon the idea that the court may indulge in an assumption on the subject, although the assumption that she is a wife would perhaps be shown to be false, if the witness were permitted to explain her seeming incompetency, and the assumption that she is not a wife might be shown to be false by the verdict.

" The defendant has no right to call upon the court to receive an offer which places them in any such position, or exposes their ruling to any such absurdity in its results. It is rather to be said, that when the competency of the witness depends upon the very fact in issue, the witness is never competent. That competency is in doubt by the very state of the case, and there is no mode of removing the doubt but by the verdict. If the plaintiff has given evidence which is *prima facie* sufficient, the witness is incompetent upon the proofs given. If the plaintiff has not given such proofs, he should be non-suited. In neither case is the examination of the witness by the defendant proper. The embarrassment or hardship, if any, results from the very nature of the case, and the party who offers the witness must bear the consequences of a difficulty that cannot be overcome.

" * * * it is the defendant, in a case like the present, who calls upon the court to make an assumption, and that in the face

of such *prima facie* proof. He offers the witness. The law upon the proofs already given declares the alleged wife, *prima facie*, incompetent, and the defendant now asks the court to assume that she is not the wife, and so receive her.

" I apprehend he has no right, as a matter of law, to require the court to make any assumption, but just the inference from the case as it there stands. So long as any rules touching the admissibility of evidence exist, they can only be administered by requiring the court to pass upon just such questions as these, without any merely hypothetical assumptions, and to dispose of them upon the evidence appearing in the case at the time when the testimony is offered."

To this court the foregoing exposition seems unanswerable. In addition, however, the court feels that there is a further element worthy of consideration. This mother has held herself out to these children and to the world as the lawful parent of her children, and with public policy what it has frequently been stated to be, she should be held equitably estopped to change her position in this regard to their detriment.

In its present aspect, the question is apparently unique in Anglo-Saxon jurisprudence, for so far as a most diligent search of decided cases in all jurisdictions has disclosed, this is the first time in history where a mother has shown herself so utterly lacking in the fundamental qualities of parenthood as to co-operate in an attempt to brand with the eternal stain of bastardy her admitted children, to their detriment. What her motive may be and what considerations, material or otherwise, may have induced such an unnatural action, is not disclosed, but even if the court were inclinded to consider her a competent witness, it would feel that her testimony was most suspicious and open to grave question.

Turning to the second link in the chain of proof which the petitioner must forge to achieve a determination of bastardy, namely, that the applicable law invalidates a non-ceremonial marriage, it must be obvious that here, too, the demonstration is hopelessly inadequate.

It is, of course, fundamental that our courts will not take judicial notice of either the wording or interpretation of a statute of any other State or foreign country (*Southworth* v. *Morgan*, 205 N. Y. 293, 296; *Harris* v. *White*, 81 id. 532, 544; *First Nat. Bank* v. *Fourth Nat. Bank*, 77 id. 320, 331; *Murrin* v. *Archbald Consolidated Coal Co.*, 232 id. 541, 543. See, also, *Firment* v. *Rochester & Pittsburgh Coal & Iron Co.*, 170 App. Div. 307, 312); that such foreign law can only be learned as a fact from the evidence adduced (*Hull* v. *Mitcheson*, 64 N. Y. 639, 640; *Phœnix Insurance Co.* v. *Church*, 81

id. 218, 226; *Robb* v. *Washington & Jefferson College*, 185 id. 485, 496; *Genet* v. *Del. & Hud. Canal Co.*, 163 id. 173, 177; *Van Wyk* v. *Realty Traders, Inc.*, 215 App. Div. 254, 256; *Storrs* v. *Northern Pacific Railway Co.*, 148 id. 403, 406; affd., 208 N. Y. 629), and that the court, in this respect, is absolutely confined to the record. (*Southworth* v. *Morgan*, 205 N. Y. 293, 296.)

In the absence of proper proofs to the contrary, it will be presumed that the law of another State or country is the same as our own (*Ellis* v. *Kelsey*, 118 Misc. 763, 767, 768; affd., 208 App. Div. 774; 214 id. 784; affd., so far as this point is concerned, 241 N. Y. 374, 379; *Hynes* v. *McDermott*, 82 id. 41, 48; *McCulloch* v. *Norwood*, 58 id. 562, 567; *Harris* v. *White*, 81 id. 532, 544); that the common law prevails in another State (*Carstairs* v. *Spear*, 201 App. Div. 418, 422; *Robb* v. *Washington & Jefferson College, supra; Van Wyk* v. *Realty Traders, Inc., supra; Southworth* v. *Morgan, supra*), and that its courts agree with ours in its interpretation. (*People* v. *Brady*, 56 N. Y. 182, 191.)

It is, of course, obvious, in any case, that the relevant law, whether domestic or foreign, is that which existed at the time the transactions in question took place, since all legal relations and conditions, including status, can become judiciable facts only as a result of actions interpreted in the light of the law at the time of, and place where, they are performed. (*Hynes* v. *McDermott*, 82 N. Y. 42, 58.)

The law relevant and important in determining the joint status of the decedent and Martha Leona Peck, and consequently the status of their children, is the law of the place or places where they sojourned and which existed from the date the man and woman first commenced their cohabitation, which common repute characterized as marital, until the time of their separation. Aside from the affidavit of the woman, the competency of which has been considered above, no evidence was offered to show when the relations began. According to the testimony of Ella Hawkins it ended at some indefinite time prior to about 1922. If the mother's affidavit were considered properly in evidence, the relationship might be considered to have had its inception in 1908. As a result, so far as concerns California law, the relevant period would, on this basis, be from 1908 until about 1922, since even if the marriage was initially invalid by reason of statutory inhibition, a subsequent common-law marriage would have come into effect by the removal of the impediment, if it occurred. (*Matter of Grande*, 80 Misc. 450; *Hynes* v. *McDermott*, 91 N. Y. 451; *Matter of Meehan*, 150 App. Div. 681.)

It follows that to establish that the statutes of California inhib-

ited the common-law marriage which our laws would have validated, it was incumbent upon the petitioner to prove such statutes and their interpretation at all times during this period, and to show that their interpretation supported his contention.

The only proof of this order is found at pages 13 *et seq.* of the record, where certain statutory sections were read upon the record. This was pursuant to stipulation, which, so far as material, reads: " The following is a true copy of Sections 55, 69, 195 and 1387 of the Civil Code of the State of California * * *." Then follows the stipulated wording of the specified sections. This record was made on March 12, 1930. It undoubtedly proves by agreement that the wording set forth was, so far as it went, the statutory law of California *on that date*, but this is no proof whatsoever of the law twenty-two years earlier or at any intermediate time, since, as noted above, the law is firmly established that presumptions do not run backward. Furthermore, there is authority for the position that even if it should be determined that this law was in effect on the first day of the pertinent period, it would not be presumed as against the presumption of legitimacy that it continued thereafter. (*Hynes* v. *McDermott*, 82 N. Y. 42, 57, 58.) So far as proof of the applicable law is concerned, the petitioner has completely failed to offer anything of any pertinence whatsoever.

Considering, however, the sections introduced into evidence and overlooking for the moment that they were not proved to have been the California law at any time of importance under the issues, it is found that the only relevant sections quoted are sections 55 and 69. The former reads: " Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making that contract is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization authorized by this code."

Section 69 provides for the obtaining of marriage licenses. The other two Code sections cited are 195 and 1387. The former concerns only questions of evidence upon which, universally, the law of the forum is controlling. This is too familiar to require citation of authority. Section 1387 concerns inheritance by illegitimates. The quotations from the Code of Civil Procedure relate wholly to questions of presumption, *i. e.*, evidence, and are, therefore, immaterial for like reason as section 69, *supra*. The remaining sections quoted concern the State Bureau of Vital Statistics and have no relevancy on the question now considered.

The whole matter of the interpretation contended for by the petitioner, therefore, centers upon section 55 and particularly upon its last clause, to the effect that marriage " must be followed by a

solemnization authorized by this code," but no evidence has been introduced by the petitioner as to what solemnization *is* so authorized.

Although, as hereinbefore noted, the burden was upon him to prove not only the statutes upon which he relied, but also decisions of the State interpreting those statutes in accordance with his contention, he has neither proved nor cited a single California case holding that the effect of this statute is to render invalid a non-ceremonial marriage, and the court has been unable to find any case so determining. Under such circumstances, the statute, if relevant at all, must be construed in the light of the applicable common law on which we have the highest conceivable authority.

In *Meister* v. *Moore* (96 U. S. 76) the United States Supreme Court points out that marriage is a common-law right, statutory regulation of which must be strictly construed. While the entire opinion is extremely pertinent in this connection, it will suffice to quote the statement from Greenleaf, which is approved at page 80: " Though in most, if not all, the United States there are statutes regulating the celebration of marriage rites, and inflicting penalties on all who disobey the regulations, yet it is generally considered that, in the absence of any positive statute declaring that all marriages not celebrated in the prescribed manner shall be void, or that none but certain magistrates or ministers shall solemnize a marriage, any marriage, regularly made according to the common law, without observing the statute regulations, would still be a valid marriage."

In view of this rule of law and the presumption of applicability of the common law, it must follow that when the California Legislature said that " consent alone will not constitute marriage," it had in mind, as has frequently been held under the common law, that such consent must be followed by cohabitation (See *Tracy* v. *Frey*, 95 App. Div. 579, 588; *Matter of Seymour*, 113 Misc. 421), and not that a non-ceremonial marriage was void.

Finally, even though it were held that the mother's testimony was competent, that the applicable California law had been proved, and that it had been shown to invalidate a non-ceremonial marriage, nevertheless in the opinion of the court the petitioner's contention could not prevail.

The mother's statement that the children were born " out of wedlock " following her statement of breach of promise to have a " marriage ceremony performed," would be construed as a mere conclusion on her part that a marriage ceremony was necessary to a valid marriage (*Tracy* v. *Frey*, 95 App. Div. 579, 587–591; *Matter of Taylor*, 9 Paige, 611, 617), while the allegation of their going to

an " adjoining town," in view of the presumption in favor of legitimacy would be construed as having taken them into another State where common-law marriage was valid, and an actual marriage consummated. (*Matter of Seymour*, 113 Misc. 421.)

It is, therefore, apparent that the petitioner has failed in every single step of his proof to have the admitted " little ones " of his deceased brother branded as bastards through life. The admitted proof shows, however, that the decedent's marriage had terminated prior to his death, for which reason his former wife is not entitled to share in the estate.

The court, therefore, finds and determines that Zola Smith Molm, Harry Jamison Smith and John Priest Smith were the legitimate children of this deceased, Harry Jamison Smith; that they are his sole heirs at law and next of kin and as such are the sole distributees of his estate.

Submit decree, on notice, accordingly.