## In the Matter of the Estate of Leta M. Barnes, Deceased.

Surrogate's Court, Monroe County, October 2, 1933.

*Cobb, Cosgrove, Harter & Wright,* for the executors.

*Backus & Backus,* for respondent widower.

FEELY, S.   Testatrix died on March 15, 1931, leaving a last will, dated in 1929, to which she added a codicil on December 10, 1930; but in none of them was any provision made for her husband.   She left no parents nor descendant; but only her husband and some collateral relatives.   Her estate is amply solvent, consisting of $3,000 in personal property and $2,500 in real estate.

It was shown herein, by the husband's own testimony, that in 1916, after eighteen years of lawful marital cohabitation, he was discharged from his position as a railroad conductor on the charge of drinking while on duty.   He at once surrendered to his wife any interest he had in her property, or in what they may have held together, and left her.   There is no evidence or suggestion of any ante-nuptial contract, nor of any separation agreement; and it is

clear there was never any action brought by either for a separation, or for a divorce. He did not live with her, nor do anything whatever toward her support, for the remaining fifteen years of her life. Aside from witnesses whose competency to testify was challenged, it was shown that during the rest of her life after the separation, she supported herself wholly by her own efforts, living alone most of that time in small quarters, or as a roomer and boarder. During the time they lived apart, they happened to meet once, at a funeral, when the crowded state of the conveyance made it necessary for her to ride seated on his lap.

(1) On those facts, the husband must be found to have neglected and refused to provide for his wife and to have abandoned her, within the meaning of subdivision 4 of section 18 of the Decedent Estate Law, and thus forestalled any right on his part to success in his claiming the modern statutory share against the provisions of her last will, by which he was excluded from her bounty.

(2) Next, it is urged also that even if he had such right, he did not go about claiming it in the proper way. Upon his having been served in Michigan with the citation for probate, he wrote the attorneys for the executor for, and was supplied by them with, a copy of the will that had been filed; and he at once sent by registered mail, on May 25, 1931, the carbon copy of a typewritten letter, subscribed by him with his own hand, giving his address, to the attorneys for the executors, and also reciting a copy for the clerk of this court, wherein he said, in substance, that if a certain diamond ring, which he claimed to be his property, were delivered to him, he would " then have no objections to the will being executed as is." This letter clearly and directly brought to the knowledge of the persons in legal charge of the estate that the surviving spouse claimed, against the will, only this property, that was obviously of far less value than would be his elective share. No reply was made to this proposal, nor any other steps taken by the husband; and so the will went to probate by the decree of May 29, 1931, on which letters testamentary issued at once.

In passing, it may be said that there is competent evidence to show that although this ring, with the diamond in a Tiffany setting, may have been purchased by him about 1905, for about $300, yet he had later made a gift of it to his wife, who wore this stone in a lady's setting for several years before the separation in 1916. It is now the property of the legatee to whom the testatrix specifically bequeathed it.

An election made under section 18 of the Decedent Estate Law must, under subdivision 7, be made within six months from letters, " by serving written notice of such election upon the representative

of the estate personally  \* \* \*  and by filing and recording a copy of such notice, with proof of service, in the surrogate's court where such will was probated."

On the trial, on July 17, 1933, over two years after letters issued, in order to meet the objections then first made by the executor, there was filed by the husband his affidavit, with two receipts, still undetached from each other, which he received from the postmaster in Michigan, for two pieces of mail, the serial number on one of which is the facsimile of the number stamped on the envelope of the letter mailed thence to the attorneys for the executors; but the companion letter, the ribbon copy, said to have been mailed to this court, has not yet been found; nor any minute or record of its having ever been received or filed. For the purpose of this argument, I assume it was received and mislaid. In this affidvait the husband says that the letter and envelope produced by the attorneys for the executors, as Exhibit 2 herein, bearing date May 25, 1931, is one of the two he so mailed.

It may be argued that the statutes on election were enacted to accomplish the humane purpose of protecting a faithful surviving spouse from being wholly cut off by the last will of the other spouse; and that the statute expressly declares it shall be construed liberally (Laws of 1929, chap. 229, § 20); and to that end the court should liberally construe this section on notice — at least in so far as concerns the procedural steps taken to secure the elective rights, after having promptly manifested to the proper party, in writing, in a practical, if not a strictly legal manner, the intention so to do; and that this section somewhat confirms this view by its expressly allowing this court to extend the time, " before its expiration \* \* \* for a further period of not exceeding six months upon any one application " (Dec. Est. Law, § 18, subd. 7), upon reasonable cause shown — implying evidently that no attempt at compliance had yet been made. Still some of the cases from other States, with similar, if not identical statutes, are cited in *Matter of Zweig* (145 Misc. 839), which seem to favor a strict compliance, on the theory of condition precedent to obtaining a statutory right. Neither the *Zweig* notice, nor the *Lottman* (id.) notice appear to have been seasonably filed. The latter (with a typed signature, made by the attorney) was said by the executor never to have been served at all; and the like feature seems indicated by the statement in the *Zweig* case that the widow " claims to have served " a notice. In both those cases the motions for leave to file were made after the first six months. In this case now at bar both the service of a genuine notice and the filing, such as they were, occurred in the probate proceeding itself; but were irregular in form.

It is pointed out in the *Zweig Case* (*supra*, 848) that the lack of an acknowledgment alone was held fatal under the Indiana statute; and the loss in the mail of the papers addressed to the court was held to render the notice ineffectual under the Iowa statute. I have not been able yet to ascertain how closely those statutes resemble ours, or whether they contain the same provision for liberal construction. However, no motion was ever made herein for leave to serve the executors personally with an amended or supplementary notice, and to file it, *nunc pro tunc*, with proof of such service, so that certification of such public record might be elsewhere filed and recorded in so far as title to land might be effected. From the viewpoint of our own statute, I can now only say that had such motion been made, even as late as judicial settlement, on the peculiar facts of this case, my present inclination would be to grant it; but inasmuch as the foregoing finding on abandonment defeats any right to elect against this will, it is not now necessary to decide the question whether the procedure taken herein to perfect such right as had already been seasonably claimed was in substantial compliance with a statute expressly intended to favor the claimant. The only order made by this court was that the affidavit above described might be filed, over the objections of the executors, with decision reserved as to its effect and legal sufficiency.

(3) Lastly, the recreant husband's demand for delivery to him of certain property exempt, under section 200 of the Surrogate's Court Act, from claims of creditors of the deceased, is resisted on the novel ground that the modern tendency of the courts and of the Legislature, especially in the greatly increased " exemptions " from creditors and in the enactment of the right of testamentary election, has been to be far less lenient to such a faithless spouse than were the case had he applied under the Revised Statutes of 1829. At that time, when people were not crowded into cities, and the farm lands were well populated, the statutes prevented a creditor, executing his judgment with the aid of the sheriff's levy, from going to the unsocial extreme of stripping the debtor of every last thing he had, even of the least outfit for family housekeeping that could be imagined. The old statute defined, in the language of its day and age, that irreducible minimum of a domestic outfit by the well-known list of property exempt from seizure under a creditor's execution, both in the lifetime of the debtor and after his death; beginning with the spinning wheels, weaving looms, ten sheep with their fleeces, and the yarn and cloth manufactured from the same; one cow; two swine, and the pork of such swine; and the necessary food for those animals, and for the widow and minor children, for sixty days after the death of the debtor; together with certain

household furniture, so long as the widow retained it in her possession and lived with and provided for the minor children. The statute also includes " books, used by or in such family, and books  *  *  * used as part of the family library." Obviously, " The exemption was made for the benefit of the family, rather than its head, the debtor. Its object concerns a question of public policy. It is to keep together the wife and children, that the latter may be trained and educated to become useful members of society; to protect them against the dangers to which they would be exposed by being scattered, at a tender age, and to secure them the means of instruction and improvement." (*Griffin* v. *Sutherland,* 14 Barb. 456, 459.)

The object is to prevent families from being stripped of the last means of support and left to suffer, or cast a burden upon the public.  (25 C. J. 32.)

The purpose of the statute is the protection of families against being, by the process of execution, divested of the necessaries for support, which the exempted articles may furnish and provide the means to supply.

The word " family " is defined, broadly, as a collective body of any two persons living together in one house as their common home, for the time; but this section limited the group to spouses or minor children.

The statutory purpose of enabling such a group to carry on, after the death of the debtor, by withholding from the decedent's creditors and by insuring to his intimates and dependents the least outfit for a home, as defined in the statute, has not changed in the changes of the times from 1829 to the statutory enlargement of family rights in 1929.  To keep the " family " group together is the object that is still sought today, although the sheep and fleece have disappeared, and with them the weaving looms and the homespun; and the sewing machine has replaced the loom; and the winter pork barrel has no place in modern cellars; and the team has made way for the motor vehicle and tractor, and sums of money are allowable in lieu of some of those items of the minimum domestic outfit necessary for a family to carry on.

In dealing with section 200 of the Surrogate's Court Act, entitled " Exemption for benefit of family," the revisers of 1914 add this note to their amendments: " This section has been unchanged so long that it was thought advisable to make radical changes.  The amount of exempt property is greatly increased.  *  *  *.

" Title to exempt property given to surviving husband or wife, as division of it, according to part of section repealed, has been almost impossible in practice."

This acquisition of title, of course, presupposes the existence of the threshold conditions contemplated by the statute in the words, " having a family." Only then, as I see it, should the word " may " be read " must," as to allowing the exemptions as late as on judicial settlement. (Surr. Ct. Act, § 262; *Matter of Draper*, 109 Misc. 404.) When once title has been thus obtained, it may be deemed to have vested as of the death of the decedent. (*Vedder* v. *Saxton*, 46 Barb. 188.)

As for increase in amount, in 1829 the statute mentioned sums of money which total $350; whereas the statute of 1929 fixed sums which total $1,800. The Commission, in suggesting this last increase, add a note which emphasizes the idea of " family " and " dependence," viz., " New York State is behind many other States of the Union in providing adequate exemptions to the *dependents* of the deceased."

Their suggestion is that our statute be brought into " accord with the exemption benefits in many other States and proportionate to the necessities for financial support for the *dependents* of a decedent in the period of *family readjustment* after death." (Legis. Doc. 1930, No. 69, p. 276.)

At this time also there was a clarification of the statutory rule that when death resulted from wrongful act, abandonment by a spouse barred his or her participation in the dependence recovery. (Laws of 1929, chap. 229, § 7;* *Matter of Hess*, 143 Misc. 335.)

Meantime, a wife had been enabled to contract directly with her husband; women have been enfranchised; and the action of one spouse in obtaining anywhere a decree of " divorce," good or bad in this State, had come to be recognized by our courts as an estoppel on that plaintiff spouse from inheriting from the other; and a declaration to that effect was added to the statute in 1929; and at the same time, the main condition imposed on a spouse obtaining the new elective share as against an unfavorable last will, was domestic fidelity in the matter of support and cohabitation. These provisions on abandonment and non-support, as a bar to an election, are not expressly embodied in that part of the enactment of 1929 which enlarged sixfold the family rights in property exempt from decedent's creditors; but this court is now asked to say that, by analogy and in keeping with the spirit of these modern statutes, the same condition of domestic faithfulness, embodied in the term " having a family," should apply to one spouse, who despite the claims of creditors, seeks the minimum family outfit to carry the " family " on, after the death of the other spouse. Marriage alone is not enough; there must be a " family " relation existing also. This was recognized very recently when the Court of Appeals, in

---

* Amending Surr. Ct. Act, § 133.

*Matter of Burridge* (261 N. Y. 225), said, in passing, that " In the light of the history of the statute there can be no doubt that the exemptions were intended, primarily, to provide for the comfort and support of the family when the owner of the property, which has been used for family support and comfort, dies. (*Wilcox* v. *Hawley*, 31 N. Y. 648; *Becker* v. *Becker*, 47 Barb. 497.)

" However broad the definition we may give to the word ' family ' as used in the statute, yet by the terms of the statute itself, the exemption is granted where a person ' *having a family* ' dies. It is not enough that the decedent leaves a widow or husband or minor child or children. There must be a bond, however loose, which creates a collective ' family.' "

If this matter is to be considered only in that light, this recreant husband, who for the last seventeen years of the life of his wife steadily tried, by neglect, to destroy any family setting being maintained by his deserted wife — and who succeeded to the extent described above till at last she was found alone, trying to support herself, and to live and sleep in one room and cook in a clothes closet, under the roof of a stranger — could hardly be regarded with favor when he now returns for the sole purpose of seizing the wreckage under the pretense that the statute insures it to him, as against the creditors of the deceased, for the purpose of his carrying on the " family." By his own long course of wrongdoing he had brought it to pass that when the end of her life came, his abandoned wife was not a " person having a family," within the meaning of the modern statutes. It is now too late for him to claim to be entitled to that which the law says is the least for a family to carry on withal. There was no family to carry on, so far as he was concerned or cared. To compel her estate, to this or any extent, to support him now, is to limit, in effect, her modern right to cut him off entirely by her last will, just as she did. This can run on into absurdity. Her will might legally cut him off entirely, for having abandoned her, where else he could have taken half of her net estate, despite the will; and if she died leaving only the $1,800 worth of property specified in the exemption section, he would still take it all anyway, notwithstanding his abandonment of her. So, her will, cutting him off altogether, for abandonment, would be good but ineffectual; and yet all she left could be taken by him under the exemption statute, despite the abandonment. She, at the time of her death, would then be both a " person having a family " and also one not " having a family." So, if the respondent's claim be correct, the sixfold increase in the exemptions simply puts a greater premium on his abandonment; whereas the abandoned wife can escape further injury only by compromise or by adultery if she is not

lucky enough to catch him at fault. If successful, the most he could get herein would be not over $84 in household furniture, and $300 in money.

Old decisions, under older statutes, some of the latter over a century old, if they be pertinent today, seem to support the claim of the recreant husband. They all come down to this legalistic sort of reasoning, " Having a wife is having a family," even though she be living apart, because the marriage has never been dissolved. This view substituted an abstract idea for the practical reality contemplated by the statutes. The leading case of those cited me is *Matter of Shedd* ([1891] 60 Hun, 367), where the husband, although he had not lived with his wife for ten years, nor supported her directly for the last eight of the ten, had, however, bought clothing for their daughter all during her minority and while she was living with her mother. The daughter became of full age three years before her father's death. He was held to be a man " having a family." His having supported the daughter had relieved the mother of just so much for many years. An actual " family " setting existed that he had not wholly abandoned.

On the authority of this *Shedd* case, one of my predecessors on this bench decided *Matter of Schofield* (unreported) in 1910. There the deceased, for the last six years of his life, had lived apart from his childless wife, without a legal separation, and she was awarded exempt property on final settlement, although as his administratrix she had omitted to set it apart in her inventory. There the then surrogate said: " As long as a man has a wife living, and no legal proceedings have separated them, and whether living under the same roof, or living miles away, she is still his wife; he is in law bound to support her; she belongs to and is a part of his legal family, even if he does not practically keep his family together."

Those two cases were regarded as binding this court in 1915 in *Matter of Osborn* (unreported, but affd. in 175 App. Div. 966, and also in 220 N. Y. 595, without opinion in either review). These Osborns married in 1895, and cohabited until 1900, when his ill health and bad temper led to a written agreement of simple separation being made; whereupon he left her and lived apart for the next fifteen years, until her death. Apparently, the separation was not a complete, or at least, a lasting one; for they were writing letters to each other thereafter; and in 1902 she loaned him seventy-five dollars as he was unwell and not fortunate in finding work enough; and as late as 1911 and 1913 he was again writing her for money, but the record does not disclose whether she ceased to help him any more. The then surrogate allowed the exemptions, but without costs as against the estate, and held that concededly the written

agreement did not in law dissolve the relationship of husband and wife; and that the case fell under the ruling made in the *Schofield* case, following as an authority the *Shedd* case. The record of the *Schofield* case is barren of detail; but in the *Shedd* case and the *Osborn* case there are clear indications the separation was not as absolute as in the case now at bar.

Yet it was on the *Shedd* case that the surrogate of Montgomery county in 1921 based his ruling in *Matter of Schulenburg* (114 Misc. 155). There, as in the *Schofield* case, the wife was childless. One year after their marriage in 1888 the childless wife of this decedent gave him a release of dower and other rights she might have in and to his property. In so far as dower has a posthumous aspect, this release might be said to include rights accruing at his death. Thereupon they lived apart for the unprecedented space of thirty years; and she never asked, nor received support from him. He died in 1920. The court there held the contract was void; and that the childless wife was entitled to the exempt property. In holding such contracts void, the courts were probably influenced by the old rule that a wife could not contract directly with her husband; and this may account for the point not having been urged in those old cases that such a contract constituted a waiver of the exemptions. Recently, however, the Court of Appeals has held that the estate of a widow who had voluntarily relinquished her right to marital support as against the husband's legal representatives could not thereafter lay claim to the exemptions. (*Matter of Burridge,* 261 N. Y. 225.) The *Schulenberg* case followed the supposed rule of the *Shedd* case, and also cited the case of *Oberndorf* v. *Farmers' Loan & Trust Co.* ([1911] 71 Misc. 64), probably for its collection of cases from other States defining the meaning of the term "family." This last case construes a testamentary provision for the benefit of a legatee, "himself and family," made in the will of the father of the legatee husband, before the separation of the legatee from his wife, as including the legatee's wife, notwithstanding the separation. The court there said: "The weight of authority, however, upholds a gift for the benefit of the husband and his family to include a childless wife who is dependent upon her spouse for support."

During the eight years between the ruling in the *Schulenburg* case and the great changes made by the Legislature in 1929, there is no reported case on this matter that has come to the attention of this court; nor one that has taken into account the effect of those recent enactments. In *Matter of Burridge* ([1933] 261 N. Y. 225) the Court of Appeals was called upon only to construe a separation agreement made in 1917, and amended in 1929, so as to bind the

obligor husband's estate; and the only question there decided was "whether the wife has voluntarily relinquished her right to claim the exemption" (p. 228); and it was finally held that such was the effect of her contracts aforesaid. *Obiter* and *arguendo* only the opinion refers briefly to the *Shedd* case and the *Osborn* case, without regard to the recent statutes, although the husband died after they had taken effect. These statutes expressly sanction just that sort of agreement. Their bearing here appears to be still an open question.

On the whole, it seems to me to be going quite against the trend and spirit of this day to carry over the old legalistic rule that was supposed to govern those cases; and today, on the authority of them, to decline the modern, practical and consistent conclusion that in so far as concerns this runaway husband, this testatrix, at her death, could not properly be said to be a "person having a family," to be carried on, within the meaning of section 200 of the Surrogate's Court Act, as amended in the general 1929 revision of the Decedent Estate Law. Some of those old cases may be correct in their result, on their own facts, as stated; but as for the law that some of them cite to justify their conclusion, there may be debate. Any way, they belong to a day in which the rights of surviving spouses were far less favorable than is the case today. The present increases and new rights in their favor are not without their corresponding responsibilities. It seems to me, therefore, that this husband, by reason of his having abandoned this testatrix, for and during the last fifteen years of her life, is not entitled, under the present state of the law, to claim any property of this estate, and particularly such as is exempted from her creditors so as to enable a decedent's "family" or dependents to carry the "family" on through the "period of family readjustment after death." As for him, she had no family life whatever after he abandoned her, and because he had abandoned her.

Enter the decree in accord with this decision.