In the Matter of the Estate of SARAH SITKIN, Deceased.

Surrogate's Court, Kings County, May 12, 1934.

*Joseph H. Wasserman,* for the petitioner.

*Samuel C. Cantor* [*Maurice Goldberg* of counsel], for the contestant, respondent.

WINGATE, S. An interesting and apparently hitherto undetermined question respecting the effect of the newly-given right of a surviving spouse to elect to take against a will is raised in the case at bar.

Mayer Sitkin, the surviving spouse, intermarried with the decedent, Sarah, at some undisclosed time considerably prior to 1917. In that year they were residing in Holyoke, Mass. He then abandoned the deceased and his children, and remained away until some time in 1919, the wife supporting herself by her own efforts during the interval.

In or about January, 1919, he was induced by a son to return for the purpose of attending the wedding of the latter, and remained until about the end of June, 1923, when his wife was taken ill and went to a hospital. He then again left, and never subsequently lived with, or returned to, or visited, or in any wise contributed to the support of, the deceased or their children.

By her will the deserted wife and mother bequeathed her entire property to her children, with the exception of the ritualistic one dollar left to the husband, stating in this connection " that he is to receive none of my worldly goods, as all that I now own and possess has been received from my beloved children." According to the account the net estate, without deduction for commissions or expenses of accounting, aggregates $2,370.33.

The peripatetic husband has now reappeared and asserts a right to take an intestate share against the provisions of the will, under section 18 of the Decedent Estate Law, and further claims the allowances, by way of family exemptions, specified in section 200 of the Surrogate's Court Act.

The issues as to the validity of his claims arise for determination upon the submission for judicial settlement of the final account of the executor, and are raised by the objection of the husband to the failure of the executor to either provide for the effectuation of the election, or to set aside the assets to which claim is made under section 200.

As developed on the hearing, the position of the claimant is that in June, 1923, before his final departure, he and the decedent entered into a separation agreement pursuant to which he paid her approximately $4,000 in lieu of all claims for support.

The demonstration on this phase of the case is unsatisfactory to a degree. It was shown that at the time of claimant's return from

his abandonment of decedent in 1919, claimant and decedent jointly purchased the bakery business of their son David, together with the premises upon which it was conducted. The purchase price was paid partly in cash and partly by the giving of a mortgage, and the original sums and the sums on the mortgage were both paid by the claimant and decedent individually, " each paid by an individual check," and each executed the mortgage. The conveyance was made to " Mayer Sitkin and Sarah K. Sitkin " without any descriptive designation.

On or about July 14, 1922, the claimant and decedent jointly conveyed the real estate to a third party, receiving in return separate mortgages of $2,187.50 each, and on June 30, 1923, jointly sold the bakery business which they had conducted, receiving each a check for $250 and a chattel mortgage running to both for $1,500.

The alleged separation agreement was not produced, and the only testimony respecting it was adduced by deposition from an attorney who asserted that he had drawn it and supervised its execution.

Certain features of his deposition and facts connected with it are of interest as bearing upon the reliability of his testimony. After stating that he had several times seen decedent and claimant execute papers in his office in 1922, he continued: " I do not remember the dates as this was so long ago. The last paper was signed by Sarah and Mayer Sitkin and also by Meyer Rosenberg, as trustee for Sarah Sitkin. Meyer Rosenberg is a Rabbi who was at that time in Holyoke, Massachusetts." He further testified that the last paper was prepared in triplicate and one copy given to each of the parties and one to the rabbi; that although he had made diligent search therefor, he had been unable to find his office copy.

Regarding the last alleged document, he deposed: " The last paper, signed by Mr. and Mrs. Sitkin and by Rabbi Rosenberg as trustee for Mrs. Sitkin, stated that Mr. and Mrs. Sitkin were unhappy and could not go on living together, and that they, therefore, had, were, and became permanently separated; that Rabbi Rosenberg acted as trustee therein for Mrs. Sitkin; that Mayer Sitkin gave Sarah Sitkin, and she accepted, a lump sum which was in excess of Four Thousand Dollars, and was one-half of what he had, for her support for the rest of her life in place of periodic payments; and that Mayer Sitkin also turned over to Sarah Sitkin the household furniture and belongings. As explained above I do not remember the date of this agreement; it was made in 1922, shortly after Mayer Sitkin sold his property and business in Holyoke, Massachusetts. The preceding paper was the deed conveying the property."

An interesting side light on the credibility of this witness is furnished by a letter written and personally signed by him under date of May 8, 1933, addressed to the executor. This reads:

"RE ESTATE OF SARAH SITKIN

File No. 422

"In reply to your letter of May 5th, I wish to state that I remember some years ago representing the above named party and her husband in some difficulties.

"The children are, however, under a misapprehension as there was absolutely no definite separation agreement. There was, however, a paper drawn up which was deposited with Rabbi Rosenberg who at that time was in Holyoke, however, this had absolutely no legal effect. I explained it to them at that time.

"Frankly, I am willing to do all I can to help the children for I well remember the husband for the disagreeable treatment he gave to his family, however, I guess as a matter of law, I can't be of much assistance to you.

"Very truly yours,

"(Signed)     BENJAMIN F. EVARTS."

The deposition, which was executed about nine months later, contains the following concluding statement which possesses some significance in view of the testimony of Rabbi Rosenberg to be noted later. It reads: "My recollection as to all of the foregoing * * * was refreshed by letters I received from * * * Mr. Sitkin's present attorney, by a talk I had with Mr. Sitkin personally in New York last October, and *especially by talks I had lately with Rabbi Rosenberg* and with my former secretary in my employ at the time of the signing of the agreement."

For the purpose of assaying the value of this especial refreshment of recollection in consequence of the alleged recent talks with Rabbi Rosenberg, which was so striking as to cause the witness completely to reverse his apparently deliberate statement that "*there was absolutely no separation agreement,*" a reference to the testimony of the rabbi himself is of interest. He expressly disclaimed any recollection of having acted as trustee or otherwise in, or having anything to do with, or knowing of, any separation agreement between the decedent and claimant. His only recent contact with the attorney is described by him as follows: "about March 14th, 1934, Benjamin F. Evarts, an attorney of Holyoke, Massachusetts, called me on the telephone and asked me if I recall acting as trustee for Mrs. Sitkin when a separation agreement was drawn between them and whether I had my copy of this agreement. I informed him that I did not remember any such transaction nor do I have a

copy of any such agreement. I also told Mr. Evarts about the visit of Mr. Rhine." It should be noted in this connection that the only talk Evarts had with the rabbi on this subject was twenty-one days *after* the former executed his deposition. It is a bit difficult to see how his recollection could have been " especially " refreshed by this subsequent event.

In view of the rabbi's recollection that " Sarah Sitkin often came to my home for the purpose of consulting with me. On most of these visits, religious and ritual questions were discussed," and his complete disclaimer of any knowledge of any separation negotiations in which he is claimed to have played so important a part, the most charitable view to be taken of Evarts' testimony is that his complete reversal of position represents overpersuasion by the claimant and his attorney and not an actual demonstration of the facts to which he deposed. His gross and material overstatement regarding his recent dealings with the rabbi is such as to cast serious doubts upon all his statements and to render them wholly inadequate for the task of furnishing the sole prop to support claimant's case.

The court, as the trier of the facts, accordingly determines that there is no adequate proof in the record that a valid separation agreement was entered into between the parties.

The next question relates to the proof respecting an alleged lump sum payment by the claimant in lieu of periodic payments for future support. It is, of course, well established that in the absence of fraud or inequitable conduct such a payment could absolve the husband from liability for claims by the wife for future support if actually accomplished and made pursuant to a valid agreement on her part to that effect. (*Greenfield* v. *Greenfield*, 161 App. Div. 573, 575; *Van Ness* v. *Ransom*, 164 id. 483, 487; affd., *sub nom. Parsons* v. *Macfarlane*, 220 N. Y. 605; *Levy* v. *Dockendorff*, 177 App. Div. 249, 255.) (See, also, *Gewirtz* v. *Gewirtz*, 189 App. Div. 483, 486.)

The primary essentials to any such demonstration are, however, a valid agreement and payment. Here both elements are lacking. Aside from the deposition of Evarts, which, for the reasons noted, the court deems wholly unworthy of credence, no demonstration has been made that any such agreement was entered into and claimant's earnest contention to the contrary notwithstanding, there is no showing that he ever paid his wife a single cent which did not already belong to her. She did receive certain sums, the total of which has not been clearly demonstrated, upon the sale of the bakery business which she conducted jointly with the claimant, and of the property upon which it was located. Both

assets, however, had been purchased in part by the use of her own funds and there is nothing in the record to indicate that the percentage of the avails which she received differed from the proportion of her original contribution.

Certain statements were made by claimant's counsel to the effect that under Massachusetts law all assets of the wife belonged to the husband. This was a question of fact to be proved in ordinary course (*Matter of Smith*, 136 Misc. 863, 877, 878; *Matter of Marsland*, 142 id. 230, 232), and in the absence of such proof as to the law existing at the time the alleged transactions took place (*Hynes* v. *McDermott*, 82 N. Y. 42, 58; *Matter of Smith*, 136 Misc. 863, 878), which was not forthcoming, it must be presumed that Massachusetts law at that time corresponded with that of New York. (*Matter of Klyszewski*, 140 Misc. 241, 244; *Matter of Gellis*, 141 id. 432, 436; *Matter of Dumarest*, 146 id. 442, 443.)

The conveyance of the real estate ran to both parties, which under New York law created them tenants by the entirety even in the absence of a designation descriptive of their relationship. (*Zorntlein* v. *Bram*, 100 N. Y. 12, 15; *Armondi* v. *Dunham*, 221 App. Div. 679, 681; *Matter of Baffa*, 139 Misc. 298, 299.) Being tenants by the entirety, each was possessed of a life estate in common with the other, plus a survivorship right in the whole. (*Hiles* v. *Fisher*, 144 N. Y. 306, 316; *Matter of Lyon*, 233 id. 208, 211; *Matter of Klatzl*, 216 id. 83, 86; *Bertles* v. *Noonan*, 92 id. 152, 156.) Being equally interested therein, it would follow that, on a sale, each should receive one-half of the purchase price. The rights of the wife in the business, which they held as tenants in common, mere obviously the same.

The sum total demonstration of the record is, therefore, that the claimant and decedent were validly married and that such marriage was not dissolved until the death of the latter; that in 1923 the claimant left the decedent never to return, and from that date to the time of her death never made any contribution to her support. These facts are not controverted. Going beyond this, however, there is, on the one hand, no adequate proof that such departure was with the consent of the wife or that any payment in lieu of maintenance or otherwise was made to the wife; or, on the other, that either or both of these conditions did not exist. The court is, therefore, squarely faced with the question as to the party on whom the burden of demonstration of these facts rests. Stated in other words, the problem concerns the showing which must be made to entitle an alleged surviving spouse to elect to receive an intestate share in an estate in contravention of the terms of the will.

Section 18 of the Decedent Estate Law, which gives the right of election, provides as follows:

" 1. Where a testator dies after August thirty-first, nineteen hundred and thirty, and leaves a will thereafter executed and leaves surviving a husband or wife, a personal right of election is given to the surviving spouse to take his or her share of the estate as in intestacy, *subject to the limitations, conditions and exceptions contained in this section.*" (Italics not in original.)

It will be noted that this enactment is contained in a separate and complete paragraph ending with a period. There follow fifteen other separate, distinct and complete paragraphs, each ending with a period, seven designated by the first seven letters of the alphabet and the remaining eight by the numbers " 2 " to " 9," inclusive. These, respectively, provide as follows:

(a) That the surviving spouse shall in no event receive more than one-half of the net estate.

(b) Where the intestate share exceeds $2,500 and a trust whose principal equals or exceeds the intestate share has been set up for the life benefit of the surviving spouse, the latter may elect only to take $2,500 in cash which shall be deducted from the trust principal.

(c) Where the intestate share does not equal $2,500, the spouse may elect to take it in cash in full of all rights under the will.

(d) Where the total benefits under the will equal or exceed the intestate share, and a part thereof is an outright gift of $2,500 or more, no right of election shall exist.

(e) Where the conditions are similar to those in (d), but the outright gift is less than $2,500, a right of election exists to take in cash the difference between the value of the outright gift and $2,500.

(f) Where the aggregate of the provisions under the will is less than the intestate share, the surviving spouse may take the difference in cash.

(g) Any other provision whereby the income of property is payable to the survivor for life shall have the same effect as a trust and in any computation of its value, capital value and not the value of the life estate shall be taken.

2. When effect has been given to the election, the remaining terms of the will shall remain effective so far as possible.

" 3. The right of election shall not be available to a spouse against whom or in whose favor a final decree or judgment of divorce recognized as valid by the law of this State has been rendered, or against whom a final decree or judgment of separation recognized as valid by the laws of this State has been rendered. Nor shall such right of election be available to a spouse who has procured

without the State of New York a final decree or judgment dissolving the marriage with the testator where such a decree or judgment is not recognized as valid by the law of this State.

" 4. No husband who has neglected or refused to provide for his wife, or has abandoned her, shall have the right of such an election.

" 5. No wife who has abandoned her husband shall have the right of such an election."

6. Election may be made by the general guardian of an infant or the committee of an incompetent by authorization of the Surrogate's and Supreme Court, respectively.

7. An election shall be in lieu of any right of dower and shall be made within six months from the issuance of letters by serving a written notice personally on the estate representative and filing in the office of the Surrogate's Court in which the will was probated. The court may extend the period for not exceeding six months on any one application.

8. Questions respecting right of election may be determined either in a special proceeding or upon the final judicial settlement.

9. Either spouse may waive the right of election in the modes particularly specified.

Reverting to the paragraph numbered " 1," it will be observed that the right of election is given to a surviving spouse to take as in intestacy " subject to the limitations, conditions and exceptions " contained in section 18 as an entirety. It is obvious, therefore, that it was the intention of the Legislature to incorporate by reference the subsequent " limitations, conditions and exceptions " into this first or enacting clause of the section.

It is precisely the same in respect to the quantum of the estate which may be taken by the elector as if the first section had read that he should be entitled to take his intestate share outright except in the contingencies specified in the paragraphs designated "(a)" to " (g)," and in those he should have the right only to the extent therein indicated. These were obviously the " limitations " on the right to take the intestate share absolutely by which the Legislature abridged the right granted in other cases. They were likewise conditions on the exercise of the right, as were the provisions of the paragraphs numbered " 7 " and " 9;" " 2 " and " 8 " are merely administrative provisions and the remaining paragraphs, " 3 " to " 6," inclusive, are clearly intended to be embraced within the classification of the " exceptions " to the general grant of right given in paragraph " 1."

For present purposes, it is precisely the same as if paragraph " 1 " had been made to read: " Where a testator dies after August thirty-first, nineteen hundred and thirty, and leaves a will there-

after executed and leaves surviving a husband or wife, a personal right of election is given to the surviving spouse to take his or her share of the estate as in intestacy, subject to the * * * exceptions (that) * * * no husband who has neglected or refused to provide for his wife, or has abandoned her, shall have the right of such election."

It is well established that where an exception to a statutory right is included in the enacting clause, it is the duty of one claiming a right under the statute to prove that his case does not come within the terms of the exception. (*First Baptist Church, etc.,* v. *Utica & Schenectady R. R. Co.,* 6 Barb. 313, 319; *Rowell* v. *Janvrin,* 151 N. Y. 60, 66; *People* v. *Stedeker,* 175 id. 57, 67; *People* v. *Bailey,* 103 Misc. 366, 371.) In this statute the exception is obviously so situated, being incorporated therein by express reference.

As early as 1820 it was pointed out in *Bartlett* v. *Crozier* (17 Johns. 439, 456) that when an action is based upon a statute, it is the duty of the plaintiff to state specially every fact requisite to enable the court to judge whether a right of action exists. This statement represents the law as uniformly applied both prior and subsequent to that date. (*Austin* v. *Goodrich,* 49 N. Y. 266, 268; *People ex rel. Rogers* v. *Spencer,* 55 id. 1, 4; *Churchill* v. *Onderdonk,* 59 id. 134, 136; *Rosenstock* v. *City of New York,* 97 App. Div. 337, 341; affd. on opinion below, 181 N. Y. 550; *Harbison* v. *Propper,* 112 Misc. 588, 596; *Matter of Carey,* 196 N. Y. Supp. 773, 774, not otherwise reported.)

The right given by this statute is new to the State of New York and is in derogation of the common-law right to make a will. (*Matter of Greenberg,* 141 Misc. 874, 887; affd., 236 App. Div. 733; affd., 261 N. Y. 474.) Whereas, therefore, the right, being remedial in favor of the persons whom the Legislature intended to benefit, is to be liberally construed when their identity has been ascertained (*Matter of Greenberg, supra,* 885, 886), the construction of the statute in the determination of the persons who are thus entitled to exercise this revolutionary right must be strictly limited to its terms (*Matter of Zweig,* 145 Misc. 839, 850; *Matter of Smith,* 136 id. 863, 880; *Matter of Marsh,* 143 id. 609, 614; *Matter of Canter,* 146 id. 123, 126, 127; *Matter of Killough,* 148 id. 73, 88; *Matter of Cohen,* 149 id. 765, 783) and, on the authorities above noted, a person claiming to come within the class benefited must demonstrate " every fact requisite to enable the court to judge " that he is the sort of person in whose favor the pre-existing law has been altered.

The note of the Commission in consequence of whose efforts the alteration in the law was effected is extremely persuasive as

to the intention of the Legislature in the enactment. (*Matter of Greenberg*, 141 Misc. 874, 883; affd., 236 App. Div. 733; affd., 261 N. Y. 474; *Matter of Mihlman*, 140 Misc. 535, 536, 537; *Matter of Meyer*, 148 id. 901, 902.) It reads: " The provisions of the section deny a right of election to either a widow or surviving husband in the following cases * * * (c) where either husband or wife has abandoned the other or the husband has refused or neglected to provide for the wife." (Leg. Doc. of 1930, No. 69, p. 157.) A person coming within this description is granted no rights by section 18. The right of election is possessed only by a certain sort of surviving spouse, namely, one who has not been guilty during the lifetime of the decedent of the enumerated varieties of misconduct which, in the opinion of the Legislature, were such as to make him or her unworthy of receipt of this great privilege. It follows, therefore, that at the very threshold of any effort to exercise the right, lies the necessity of a demonstration by the attempted elector of his status as a member of the class to which, alone, it has been granted.

The problem may be approached from yet another angle in the fact that the requirement of a demonstration by the executor of the decedent that the electing spouse had abandoned or failed to contribute to the support of the decedent would be to construe the statute in a manner imposing unjustifiable hardship upon the estate, which construction, on primary principles, is to be avoided where reasonably possible. (*Matter of Meyer*, 209 N. Y. 386, 389; *Matter of Rouss*, 221 id. 81, 91; *Osborne* v. *Int. Ry. Co.*, 226 id. 421, 426; *People* v. *Santoro*, 229 id. 277, 281; *People ex rel. Hallock* v. *Hennessy*, 205 id. 301, 306; *Ewen* v. *Thompson-Starrett Co.*, 208 id. 245, 248.) As was said in the *Rouss* case: " Consequences cannot alter statutes, but may help to fix their meaning. Statutes must be so construed, if possible, that absurdity and mischief may be avoided."

To impose upon the average executor, unacquainted with the intimate personal affairs of his decedent, the burden of demonstrating the negative of the question of support by a surviving husband, or, as in the case at bar, compelling him to prove that such decedent did not consent to a demonstrated departure of the spouse who is attempting to exercise a right of election, would result in placing him under a serious and frequently insuperable handicap which must of necessity, in a large majority of cases, result in a benefit to the very persons whom the Legislature particularly desired to exclude therefrom. On the other hand, if the surviving spouse discontinued the marital relation pursuant to an agreement with the decedent or, in the case of a husband, did

furnish support, the demonstration of the affirmative should ordinarily present no serious difficulties to him.

On ordinary principles of justice, unless unavoidable, the burden of negative proof should not be imposed upon a party " when the subject matter of the negative and the means of proof thereof are peculiarly within the knowledge and power of him who claims to be within it." (*Harris* v. *White*, 81 N. Y. 532, 547.) (See, also, *Potter* v. *Deyo*, 19 Wend. 361, 363.)

In the case at bar, the departure of the claimant being admitted, his contention that this took place pursuant to the agreement and consent of his wife is identical with a plea of justification or condonation in a matrimonial action, the burden of alleging and proving which would be upon him. (*Romm* v. *Romm*, 227 App. Div. 756; *Merrill* v. *Merrill*, 41 id. 347, 349; *Risk* v. *Risk*, 202 id. 299, 302; *Abbott* v. *Abbott*, 132 Misc. 11, 13.)

The court, therefore, determines in the case at bar that the marriage, subsequent departure and failure to support being demonstrated, the burden rested upon the husband to establish by a fair preponderance of the evidence that his departure was pursuant to a valid agreement with the decedent; that he paid her a lump sum in lieu of periodic payments and that she validly agreed to accept it for that purpose. Since there is no credible evidence to establish any of these points, the court holds that the claimant has failed to establish his right to elect against the will.

The claimant cites *Matter of O'Dwyer* (151 Misc. 57) as an authority to the effect that the burden of proof in the aspects here material is on the executor. If Surrogate DELEHANTY had so held, his views would be entitled to great weight, but as this court reads this opinion, he carefully refrained from passing upon the question, holding merely that under the decision in *Public National Bank* v. *National City Bank* (261 N. Y. 316) the question of the location of the burden of proof was immaterial in determining the right to an examination before trial, the allowance thereof being discretionary with the court, and that on the facts of the case then at bar, that discretion should be exercised in favor of the moving party.

The considerations relevant in the determination of the recalcitrant husband's claim to the family exemption under section 200 of the Surrogate's Court Act have been so fully and recently considered by Surrogate FEELY (*Matter of Barnes*, 149 Misc. 149) that any further discussion of the subject would be a labor of supererogation at this time. Suffice it to say that this court is in full and hearty accord with the observations of the learned surrogate of Monroe county on this subject. It would certainly be the most arrant travesty on justice were this claimant, who deserted his

wife on the eve of her entering a hospital, apparently in a serious condition, and who carefully refrained from the performance of any family duty for half a generation thereafter, to be allowed to grab a part of her possessions under the pretext of a continuance of the family relation. Such a result will never be attained by this court except under compulsion of superior authority which is not now, and presumably never will be, existent.

Both claims of the objector are overruled, with full personal costs. Proceed accordingly.