S. Samuel Di Falco, S.
In this proceeding by the Public Administrator to settle his account, a paternal aunt of the decedent on the one hand and three siblings of the half blood on the other claim the balance of this estate. Schedule G of the account as orginally filed recognizes the aunt as the sole distributee. The siblings of the half blood have filed objections.
Decedent was born in 1900. He was the only child of a marriage of John T. Macklin and Jennie Macklin. John T. Macklin, the father of the decedent, and Jennie Macklin separated sometime in 1903. The father of the decedent in 1913 established a relationship with one Lena Furst. Three children, the objectants, were born of the relationship between John T. and Lena, one daughter and two sons. They claim relationship as siblings of the half blood to the decedent. Their claim is opposed by the sister of the decedent’s father. Lena had been born in Germany. Lena’s parents had a shop in New York City and a farm in upstate New York. Lena died in 1927. She had met the decedent while working in her parents’ shop in New York City and their relationship started in 1913. The objectant Mary was born of this relationship in New York City on July 1, 1915. By November, 1919 the decedent and Lena, the mother of these objectants, were living together at 107 Chandler Avenue in Linden, New Jersey. They lived there continuously until 1927 when Lena died. The other objectants were born in the Linden, New Jersey house, namely, Francis Thomas and George Henry. The neighbors knew the decedent John and Lena during this period as husband and wife. They held themselves out as married in Linden, New Jersey. On visits to the farm of Lena’s parents in upstate New York, they shared the same bedroom and were already regarded as being married. Lena readily accepted the appellation "Mrs. Macklin”. There is in evidence a hospital record wherein Lena was admitted to the hospital with the consent of her "husband, John Macklin”.
Sue Husosky testified. She was not related to John or Lena Macklin. She lived across the street from them when she was a child beginning in about 1924 when she was 12. Her testimony shows a good recollection of the time period. She had *378 the impression that they were married. She saw the Macklins as a family group and demonstrated a good memory of the Macklin family. She said she called Lena, Mrs. Macklin. She believed the three children to be John’s and Lena’s. Mary, one of the objectants (as a child), called Lena and John "mother and pop” or "mama and papa” according to Mrs. Husosky. The witness said that Lena told her mother that Lena and John were married.
One John Sinnot testified. He lived one block away from the Macklins for 7 or 8 years and after about 1933 or 1934 lived in the Macklin house. Although he did not know the Macklins, he "took it to be that Macklins owned it” — the house that is, and the children were always referred to by the people on the block as the "Macklin kids”.
Susan Haosleiter, Sue Husosky’s sister, testified. She, too, lived across the street from the Macklins. She remembers the whole family by name and said that she always called Lena "Mrs. Macklin” and John "Mr. Macklin”. "We knew them as Mr. and Mrs. Macklin”. The children called John "Pop” and Lena "Mom.”
Josephine Krahling, who lived across the street from the Macklins starting in 1924, testified. As to Lena she testified: "I knew her as Mrs. Macklin.” She further stated: "It was mentioned that she is married, she told me she was married.”
Admitted into evidence was the deposition of Mary K. Furst. Her husband’s parents, Nicholas and Mary Augusta Furst, were also Lena’s parents. She visited often at the Macklin home in New Jersey after 1919. She testified that Lena’s husband’s name was John Macklin. John arranged Lena’s funeral. She said: "I took it for granted they were married.” John always referred to Lena as "my wife” and the two celebrated anniversaries.
On the probate petition for John Macklin’s will, his three children are listed and their mother’s name is given as Lillian Furst Macklin. On the United States Department of Commerce census taken April 1, 1930 all three children are enumerated in the family of John Macklin. George’s birth certificate lists his father as John Macklin and his mother’s maiden name as Lillian Furst. The same is true of Francis’s birth certificate. On Lena’s death certificate her husband’s name is listed as John Macklin and he has signed as the informant. All of these factors establishing a common-law relationship occurred during a period when the law of New *379 Jersey and New York recognized common-law marriages as valid. The New Jersey law is: Section 37: 1-10 of the New Jersey Statutes Annotated: which outlaws common-law marriage as of December 1, 1939 and is effective as of July 18, 1939. The New York law was in like vein until April 30, 1933.
The court finds that under New Jersey law a common-law marriage has been established. In New Jersey: "Cohabitation and reputation raised a presumption of a preceding [common-law] marriage * * * and the strength of the presumption is in direct ratio to the length of the cohabitation.” (Franzen v Equitable Life Assur. Soc. of U.S., 130 NJL 457, 466; Dunn v O’Day, 18 NJ Mis Rep 679, 681; Simmons v Simmons, 35 NJ Super 575, 581.)
Although "common law marriages are no longer recognized * * * that legislation did not change the law as to those marriages which were consummated prior to 1939.” (Smith v Hrzich, 1 NJ 1, 4.) Further, "A marriage contracted in New Jersey in accordance with our laws is valid everywhere.” (Franzen v Equitable Life Assur. Soc. of U.S. supra, p 467.)
In New Jersey prior to 1939 a contract of marriage followed by cohabitation is just as lawful as if the marriage had been ceremoniously celebrated (State v Thompson, 76 NJL 197, 199).
In Jackson v Jackson (94 NJ Eq 233, affd 94 NJ Eq 233) the facts showed a promise of marriage followed by cohabitation. At pages 236-237 the court therein said: "Marriage is a civil contract and no ceremonial is indispensably requisite to its creation. * * * Where there is no ceremonial marriage there must be an agreement entered into between the man and the woman, in words of the present tense, to live together as husband and wife. There are probably but few instances of mutual consent, by which each party in precise or unambiguous terms takes the other as a spouse; but no particular words are necessary to declare an intention to enter into a contract of marriage. If from what was said by the parties, aided by the circumstances surrounding their entering upon their relationship, it can be gathered that they proposed to enter into a contract thenceforth to live as husband and wife, it will be sufficient”.
If the contract terms of existence are ambiguous "the intent of the parties may be examined into; and if, by their subsequent cohabitation, it is plainly apparent that they meant *380 matrimony, they are husband and wife” (Bey v Bey, 83 NJ Eq 239, 263).
It is not feasible to have witnesses to a common-law marriage in most cases. "Where, as here, there were no witnesses to the common-law marriage some other mode of proof becomes necessary to show that the parties intended to enter into such a relation. The doctrine of habit and repute ordinarily supplies such proof, but each case must be resolved on its particular facts.” (Winn v Wiggins, 47 NJ Super 215, 221). This was further explained in Costill v Hill (55 NJ Eq 479, 484): "The general rule, under proofs of the kind considered, is that where a man and a woman constantly live together, ostensibly as man and wife, claiming to be such, and so demeaning themselves towards each other, and are received into society and are treated by their friends and relations as having and being entitled to that status, the law, in favor of morality and decency, will presume that they have been legally married. Such cohabitation and repute are said to be matrimonial, in distinction from that occasional, hidden and limited cohabitation which marks the meretricious relation.” (See, also, Simmons v Simmons, 35 NJ Super 575, 580.)
The record indicates that there was some cohabitation in New York. The New York law and the New Jersey law in respect to the proof required on common-law marriage are much the same. In Matter of Benjamin (34 NY2d 27) Judge Jasen reversed the prior decision. Writing for the Court of Appeals he said at page 31: "Turning to the record before us, the Surrogate found circumstantial proof of cohabitation and reputation from the birth of Elouise in 1929 to Jacob and Olga. It was held, however, that direct proof of the marital agreement was necessary to overcome the strong presumption of validity attaching to the second or ceremonial marriage. We believe the Surrogate’s holding emphasizes unduly the role of direct proof in establishing a common-law marriage. The agreement to live as man and wife is what need be shown and it need not be proved in any particular way. (Matter of Haffner, supra.) Moreover, the Surrogate’s holding appears to overlook the documentary evidence which, if credited, reinforces the evidence of cohabitation and reputation and furnishes strong proof of a common-law marriage between the decedent and Olga Benjamin. Jacob acknowledged the child, Elouise, as his daughter in both the birth and baptismal records. His 1944 army discharge certificate recites that he *381 was then married. Although not admissible to prove the alleged common-law marriage, this latter document is indicative of Jacob’s continuing attitude about his relationship with Olga (cf. Zy v Zy, 13 NYS2d 415, 420-421) and is corroborative of what the evidence of cohabitation and reputation, the birth and baptismal records tend to show”.
Subdivision 1 of section 24 of the New York Domestic Relations Law, "Effect of marriage on legitimacy of children”, reads as follows: "A child heretofore or hereafter born of parents who prior or subsequent to the birth of such child shall have entered into a civil or religious marriage, or shall have consummated a common-law marriage where such marriage is recognized as valid, in the manner authorized by the law of the place where such marriage takes place, is the legitimate child of both natural parents notwithstanding that such marriage is void or voidable or has been or shall hereafter be annulled or judicially declared void.” (This section became effective April 30,1969.)
The Bennett Commission in its study (Report No. 1.8A, N.Y. Legis. Doc., 1965, No. 19, pp 235-271) spoke of a trend toward changing the laws concerning illegitimates. It was said at page 264: "It is important to enact legislation that will protect the rights of the illegitimate because under the present pertinent Domestic Relations Law sections governing legitimacy, a child of a voidable marriage may be declared illegitimate upon the dissolution of his parents’ marriage. The injustice of disinheriting a child who has been assumed by all the family as entitled to inherit while the marriage subsisted is apparent.” In its study the Law Revision Commission, leading to the enactment of this statute in 1969 discussed illegitimacy and its problem and found that for certain purposes children might be considered legitimate and said (1969 Report of N.Y. Law Rev. Comm., p 261, emphasis added):
"Under the present law of New York, if a child is born out of wedlock and the parties intermarry, the child becomes legitimate. However, if the marriage is void or is annulled because it is voidable, the status of the child reverts to that of an illegitimate. It seems desirable that, despite the defect in the marriage, the child be deemed the legitimate child of both his natural parents.
"Under the present law of New York, children begotten or born during a void marriage, or a voidable marriage which is annulled, may or may not be legitimate, according to the *382 elaborate provisions of section 145 of the Domestic Relations Law. It seems desirable that in this situation, too, a child of such marriage be deemed the legitimate child of both his natural parents despite any defect in the marriage.
"There is a third situation in which legislation seems to be feasible. There appears to be no reason why a child should not be regarded as the legitimate child of both his natural parents when the parents have entered into a common-law marriage in a place where such a marriage is recognized as valid”.
In its recommendation to the Legislature, the Law Revision Commission said (1969 Report, p 241): "The purpose of the bill submitted herewith is to legitimatize children whose parents have intermarried, notwithstanding the fact that such marriage may be void or voidable, or has been judicially declared to be void or has been annulled;” and later in its recommendation commented (1969 Report, p 242): "The Commission believes the legitimacy of children should be declared by statute in all cases where the parents have entered into a marriage in the manner authorized by the law of the place of the marriage, or into a common-law marriage recognized as valid in the place where it is consummated, notwithstanding the fact that the marriage may be void or voidable.”
Surrogate Sobel in Matter of Ortiz (60 Misc 2d 756 [1969]) commented on the new section 24 and said:
"The new section [24] is as comprehensive a 'marriage’ provision as any in the Nation. It does away with all former distinctions for the purposes of legitimacy between void and voidable marriages and between marriages taking place within or without the State.”
"In consequence of this new statute New York will recognize bigamous, incestuous or . other void marriages no matter where performed as legitimating from birth an illegitimate child of the parties to such a marriage” (p 759).
"As already noted, the enactment of new section 24 of the Domestic Relations Law (L 1969, ch 325) has removed from the area of conflicts jurisprudence all issues arising after the 'marriage’ of the natural parents” (p 762).
The express language of the statute is: "or shall have consummated a common-law marriage where such marriage is recognized as valid”. (Domestic Relations Law, §24, subd 1.) The attorneys for the aunt argue that a valid common-law marriage is necessary for legitimation and that this is differ *383 ent from the situation mandated by statute; that legitimation occurs regardless of the validity of a ceremonial marriage. The court does not agree with this argument. No legislation would have been required to legitimate the offspring of a valid common-law marriage. (Matter of Byrnes, 160 Misc 474; Matter of Kotlik, 152 Misc 802, adhered to 153 Misc 355; Matter of Smith, 136 Misc 863.) The purpose of the legislation proposed by the Law Revision Commission was to treat the common-law marriage, which may have been otherwise void because of an impediment, in the same way as they were treating with a civil or religious marriage that may have been void because of impediment. This statute was adopted, section 24 of the Domestic Relations Law, effective April 30, 1969.
When these parties cohabited together, according to the testimony, as husband and wife in the State of New Jersey and in the State of New York, common-law marriages were recognized in both States. It was completely unnecessary for the Legislature to have said anything about common-law marriages that were valid in section 24, as revised in 1969, unless it was the intent of the statute to legitimate children born of such a union where the marriage might have for some reason been considered to be invalid. This broadened concept is in line with legislation passed over recent years which has served to remove the stigma and hardship caused by illegitimacy. The relationship between the parents of the objectants as evidenced by the proof adduced at the hearing was that of husband and wife, which, and except for the possibility that the marriage of the father to the decedent’s mother might not have been dissolved, would have been a valid common-law marriage in New Jersey and in New York where the parents cohabited together at a time when such a union was legal in every respect. This court is in agreement with Surrogate Sobel that the New York statute will recognize any void marriage as legitimating from birth an illegitimate child of the parties to such a marriage irrespective of whether the marriage was ceremonial or of a common-law nature. This finding makes unnecessary any determination by this court as to the constitutionality of EPTL 4-1.2. This court in Matter of Belton (70 Misc 2d 814) has had occasion to rule on the constitutionality of this statute in reliance upon such cases as Labine v Vincent (401 US 532); more recently Surrogate Sobel in Matter of Flemm (NYLJ, April 8, 1975, p 19, col 5) also exhaustively reviewed the rights of an illegitimate child to *384 inherit from its father and found the New York statute to be constitutional. The rights of these objectants under EPTL 4-1.2 are no concern of the court in this case. They are, pursuant to section 24 of the Domestic Relations Law as it is presently written, legitimate. The objections are sustained. The court finds that the decedent was survived by Mary Reiley, his sister, and Francis T. Macklin and George H. Macklin, his brothers, as his sole distributees.